07 C 6603

JUDGE SHADUR
MAGISTRATE JUDGE COX

# Exhibit A

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT made this 19th day of June, 2006 by and between RZB FINANCE LLC ("**Lender**"), with an address at 24 Grassy Plain Street, Bethel, Connecticut 06801, PYRAMID STONE MFG., an Illinois corporation, with an address at 11 South Eisenhower, Lombard, Illinois 60148 ("**Pyramid Stone**") and STONE WAREHOUSE, LLC, an Illinois limited liability company with an address at 303 South Eisenhower, Lombard, Illinois 60148 ("**Stone Warehouse**" and collectively with Pyramid Stone, the "**Borrowers**" and each a "**Borrower**").

## W I T N E S S E T H

WHEREAS, the parties wish to provide for the terms and conditions upon which Loans may be made for the account of Borrowers;

NOW, THEREFORE, in consideration of any Loans made for the account of Borrower, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each Borrower, the parties agree as follows:

1.  **DEFINITIONS.**

"**Account**" shall have meaning assigned to such term in the UCC.

"**Account Debtor**" shall have the meaning assigned to such term in the UCC.

"**AccuVal Appraisal**" shall mean the appraisal of Inventory of Borrowers conducted by AccuVal and dated April 2006, as the same may be amended, restated, updated, supplemented or otherwise modified from time to time by AccuVal (unless otherwise specifically noted).

"**Affiliate**" shall mean any Person directly or indirectly controlling, controlled by or under common control with another Person.

"**Agreement**" shall mean this Loan and Security Agreement, any exhibits or schedules hereto, any concurrent or subsequent rider hereto and any extensions, supplements, amendments or modifications hereto.

"**Biscaya**" shall mean Rodrigo Biscaya, an individual.

"**Capital Expenditures**" shall mean with respect to any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including expenditures for capitalized lease obligations) by a Borrower during such period that are required by generally accepted accounting principles, consistently applied, to be included in or reflected by the property, plant and equipment or similar fixed asset accounts (or intangible accounts subject to amortization) on the balance sheet of such Borrower.

"**Chattel Paper**" shall have the meaning assigned to such term in the UCC.

"**Collateral**" shall mean all of the property of each Borrower described in Section 6 hereof, together with all other real or personal property of each Borrower now or hereafter pledged to Lender to secure repayment of any of the Liabilities.

"**Commercial Tort Claims**" shall have the meaning assigned to such term in the UCC.

"**Deposit Accounts**" shall have the meaning assigned to such term in the UCC.

"**Documents**" shall have the meaning assigned to such term in the UCC.

"**EBITDA**" shall mean, with respect to any period, Borrowers' net income after taxes for such period (excluding any after-tax gains or losses on the sale of assets (other than the sale of Inventory in the ordinary course of business) and excluding other after-tax extraordinary gains or losses) plus interest expense, income tax expense, depreciation and amortization for such period, plus or minus any other non-cash charges or gains which have been subtracted or added in calculating net income after taxes for such period, all on a consolidated basis.

"**Eisenhower**" shall mean 11 South Eisenhower, LLC, an Illinois limited liability company.

"**Electronic Chattel Paper**" shall have the meaning assigned to such term in the UCC.

"**Eligible Accounts**" shall mean the Eligible PS Accounts and Eligible SW Accounts.

"**Eligible Inventory**" shall mean Eligible PS Inventory and Eligible SW Inventory.

"**Eligible PS Accounts**" shall mean those Accounts of Pyramid Stone which are unpaid no more than ninety (90) days from invoice date or due date (whichever is sooner), and which Lender, in its sole discretion, determines to be eligible. Without limiting Lender's discretion, unless otherwise agreed by Lender, the following Accounts of Pyramid Stone are not Eligible PS Accounts:

(i)     all Accounts owing by a single Account Debtor, if twenty-five percent (25%) or more of the balance owing by such Account Debtor to Pyramid Stone is unpaid more than ninety (90) days after the invoice date;

(ii)     Accounts with respect to which the Account Debtor is an officer, director, employee, Subsidiary or Affiliate of Pyramid Stone (including without limitation Stone Warehouse);

(iii)     Accounts with respect to which the Account Debtor is the United States of America or any department, agency or instrumentality thereof;

(iv)    Accounts with respect to which the Account Debtor is not a resident of the continental United States;

(v)    Accounts in dispute or with respect to which the Account Debtor has asserted or may assert a counterclaim or has asserted or may assert a right of setoff against any Borrower;

(vi)    Accounts with respect to which the prospect of payment or performance by the Account Debtor is or will be impaired, as determined by Lender in the exercise of its sole discretion;

(vii)    Accounts with respect to which Lender does not have a first and valid fully perfected security interest;

(viii)    Accounts with respect to which the Account Debtor is the subject of bankruptcy or a similar insolvency proceeding or has made an assignment for the benefit of creditors or whose assets have been conveyed to a receiver or trustee;

(ix)    Accounts with respect to which the Account Debtor's obligation to pay the Account is conditional upon the Account Debtor's approval or is otherwise subject to any repurchase obligation or return right, as with sales made on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval or consignment basis;

(x)    Accounts to the extent that the Account Debtor's indebtedness to Pyramid Stone exceeds $100,000 (or $375,000 for indebtedness owning by Home Depot) or a greater credit limit otherwise determined by Lender in Lender's sole discretion;

(xi)    Accounts with respect to which the Account Debtor is located in a state which requires Pyramid Stone, as a precondition to commencing or maintaining an action in the courts of that state, either to (a) receive a certificate of authority to do business and be in good standing in such state, or (b) file a notice of business activities report with such state's taxing authority for the then current year unless Pyramid Stone has taken one of the actions described in clauses (a) or (b) or Pyramid Stone has proven to Lender's reasonable satisfaction that it is exempt from such requirement;

(xii)    Accounts which arise out of sales (a) not made in the ordinary course of Pyramid Stone's business, (b) which are not valid or legally enforceable, (c) which do not meet the Account Debtor's specifications (if any) or (d) which have not been shipped;

(xiii)    Accounts with respect to which the Account Debtor has refused to accept or returned to Pyramid Stone any portion of the Inventory the sale of which gave rise to such Accounts;

(xiv)   Accounts with repayment terms that extend beyond those that are normal, usual and customary for Pyramid Stone's common customer type; and

(xv)   Accounts with respect to which any material document or agreement executed or delivered in connection therewith, or any procedure used in connection with any such document or agreement, fails in any material respect to comply with the requirements of applicable law.

**"Eligible PS Full Slab Inventory"** shall mean Full Slab Inventory of Pyramid Stone which Lender, in its sole discretion, determines to be eligible.   Without limiting Lender's discretion, unless otherwise agreed by Lender, the following Inventory of Pyramid Stone is not Eligible PS Full Slab Inventory:

(i)   Inventory which is in transit;

(ii)   Inventory which is not in good condition, or not currently usable or currently saleable in the ordinary course of Pyramid Stone's business, as determined by Lender in its sole discretion;

(iii)   Inventory which is obsolete;

(iv)   Inventory which Lender determines, in the exercise of its sole discretion, to be unacceptable due to age, type, category and/or quantity;

(v)   Inventory with respect to which Lender does not have a first and valid fully perfected security interest;

(vi)   Inventory which is in process of fabrication or fabricated granite Inventory pending installation; or

(vii)   Inventory which is stored with or located on the premises of a bailee, consignee, warehouseman, processor or other third party, other than a landlord who has executed and delivered a landlord lien waiver in form and substance reasonably acceptable to Lender.

**"Eligible PS Inventory"** shall mean Eligible PS Full Slab Inventory, Eligible PS Remnant Inventory, Eligible PS Tile Inventory and Eligible PS Tagged Inventory.

**"Eligible PS Remnant Inventory"** shall mean Remnant Inventory of Pyramid Stone which Lender, in its sole discretion, determines to be eligible.   Without limiting Lender's discretion, unless otherwise agreed by Lender, the following Inventory of Pyramid Stone is not Eligible PS Remnant Inventory:

(i)   Inventory which is in transit;

(ii)    Inventory which is not in good condition, or not currently usable or currently saleable in the ordinary course of Pyramid Stone's business, as determined by Lender in its sole discretion;

(iii)    Inventory which is obsolete;

(iv)    Inventory which Lender determines, in the exercise of its sole discretion, to be unacceptable due to age, type, category and/or quantity;

(v)    Inventory with respect to which Lender does not have a first and valid fully perfected security interest;

(vi)    Inventory which is in process of fabrication or fabricated granite Inventory pending installation; or

(vii)    Inventory which is stored with or located on the premises of a bailee, consignee, warehouseman, processor or other third party, other than a landlord who has executed and delivered a landlord lien waiver in form and substance reasonably acceptable to Lender.

**"Eligible PS Tagged Inventory"** shall mean Inventory of Pyramid Stone pending fabrication that is evidenced by a signed contract/order from a customer of Pyramid Stone, which Lender, in its sole discretion, determines to be eligible.  Without limiting Lender's discretion, unless otherwise agreed by Lender, the following Inventory of Pyramid Stone is not Eligible PS Tagged Inventory:

(i)    Inventory that has been subject to a signed contract/order and has remained pending fabrication for a particular customer for more than ninety (90) days;

(ii)    Inventory which is in transit;

(iii)    Inventory which is not in good condition, or not currently usable or currently saleable in the ordinary course of Pyramid Stone's business, as determined by Lender in its sole discretion;

(iv)    Inventory which is obsolete;

(v)    Inventory which Lender determines, in the exercise of its sole discretion, to be unacceptable due to age, type, category and/or quantity;

(vi)    Inventory which is in process of fabrication or fabricated granite Inventory pending installation;

(vii)    Inventory with respect to which Lender does not have a first and valid fully perfected security interest; or

(viii)  Inventory which is stored with or located on the premises of a bailee, consignee, warehouseman, processor or other third party, other than a landlord who has executed and delivered a landlord lien waiver in form and substance reasonably acceptable to Lender.

"**Eligible PS Tile Inventory**" shall mean Tile Inventory of Pyramid Stone which Lender, in its sole discretion, determines to be eligible. Without limiting Lender's discretion, unless otherwise agreed by Lender, the following Inventory of Pyramid Stone is not Eligible PS Tile Inventory:

(i)  Inventory which is in transit;

(ii)  Inventory which is not in good condition, or not currently usable or currently saleable in the ordinary course of Pyramid Stone's business, as determined by Lender in its sole discretion;

(iii)  Inventory which is obsolete;

(iv)  Inventory which Lender determines, in the exercise of its sole discretion, to be unacceptable due to age, type, category and/or quantity;

(v)  Inventory with respect to which Lender does not have a first and valid fully perfected security interest;

(vi)  Inventory which is in process of fabrication or pending installation; or

(vii)  Inventory which is stored with or located on the premises of a bailee, consignee, warehouseman, processor or other third party, other than a landlord who has executed and delivered a landlord lien waiver in form and substance reasonably acceptable to Lender.

"**Eligible SW Accounts**" shall mean those Accounts of Stone Warehouse which are unpaid no more than ninety (90) days from invoice date or due date (whichever is sooner), and which Lender, in its sole discretion, determines to be eligible. Without limiting Lender's discretion, unless otherwise agreed by Lender, the following Accounts of Stone Warehouse are not Eligible SW Accounts:

(i)  all Accounts owing by a single Account Debtor, if twenty-five percent (25%) or more of the balance owing by such Account Debtor to Stone Warehouse is unpaid more than ninety (90) days after the invoice date;

(ii)  Accounts with respect to which the Account Debtor is an officer, director, employee, Subsidiary or Affiliate of Stone Warehouse (including without limitation Pyramid Stone);

(iii)  Accounts with respect to which the Account Debtor is the United States of America or any department, agency or instrumentality thereof;

(iv)    Accounts with respect to which the Account Debtor is not a resident of the continental United States;

(v)    Accounts in dispute or with respect to which the Account Debtor has asserted or may assert a counterclaim or has asserted or may assert a right of setoff against any Borrower;

(vi)    Accounts with respect to which the prospect of payment or performance by the Account Debtor is or will be impaired, as determined by Lender in the exercise of its sole discretion;

(vii)    Accounts with respect to which Lender does not have a first and valid fully perfected security interest;

(viii)    Accounts with respect to which the Account Debtor is the subject of bankruptcy or a similar insolvency proceeding or has made an assignment for the benefit of creditors or whose assets have been conveyed to a receiver or trustee;

(ix)    Accounts with respect to which the Account Debtor's obligation to pay the Account is conditional upon the Account Debtor's approval or is otherwise subject to any repurchase obligation or return right, as with sales made on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval or consignment basis;

(x)    Accounts to the extent that the Account Debtor's indebtedness to Stone Warehouse exceeds $175,000 or a greater credit limit otherwise determined by Lender in Lender's sole discretion;

(xi)    Accounts with respect to which the Account Debtor is located in a state which requires Stone Warehouse, as a precondition to commencing or maintaining an action in the courts of that state, either to (a) receive a certificate of authority to do business and be in good standing in such state, or (b) file a notice of business activities report with such state's taxing authority for the then current year unless Stone Warehouse has taken one of the actions described in clauses (a) or (b) or Stone Warehouse has proven to Lender's reasonable satisfaction that it is exempt from such requirement;

(xii)    Accounts which arise out of sales (a) not made in the ordinary course of Stone Warehouse's business, (b) which are not valid or legally enforceable, (c) which do not meet the Account Debtor's specifications (if any) or (d) which have not been shipped;

(xiii)    Accounts with respect to which the Account Debtor has refused to accept or returned to Stone Warehouse any portion of the Inventory the sale of which gave rise to such Accounts;

(xiv)    Accounts with repayment terms that extend beyond those that are normal, usual and customary for Stone Warehouse's common customer type; and

(xv)   Accounts with respect to which any material document or agreement executed or delivered in connection therewith, or any procedure used in connection with any such document or agreement, fails in any material respect to comply with the requirements of applicable law.

"**Eligible SW Full Slab Inventory**" shall mean Full Slab Inventory of Stone Warehouse which Lender, in its sole discretion, determines to be eligible. Without limiting Lender's discretion, unless otherwise agreed by Lender, the following Inventory of Stone Warehouse is not Eligible SW Full Slab Inventory:

(i)   Inventory which is in transit;

(ii)   Inventory which is not in good condition, or not currently usable or currently saleable in the ordinary course of Stone Warehouse's business, as determined in Lender's sole discretion;

(iii)   Inventory which is obsolete;

(iv)   Inventory which Lender determines, in the exercise of its sole discretion, to be unacceptable due to age, type, category and/or quantity;

(v)   Inventory with respect to which Lender does not have a first and valid fully perfected security interest; or

(vii)   Inventory which is stored with or located on the premises of a bailee, consignee, warehouseman, processor or other third party, other than a landlord who has executed and delivered a landlord lien waiver in form and substance reasonably acceptable to Lender.

"**Eligible SW Inventory**" shall mean as of any date of determination, the sum of Eligible SW Full Slab Inventory and Eligible SW Tagged Inventory.

"**Eligible SW Tagged Inventory**" shall mean Inventory of Stone Warehouse that is evidenced by a signed hold and tag order from a customer of Stone Warehouse, which Lender, in its sole discretion, determines to be eligible. Without limiting Lender's discretion, unless otherwise agreed by Lender, the following Inventory of Stone Warehouse is not Eligible SW Tagged Inventory:

(i)   Inventory subject to a signed hold and tag order for more than one hundred and twenty (120) days;

(ii)   Inventory which is in transit;

(iii)   Inventory which is not in good condition, or not currently usable or currently saleable in the ordinary course of Stone Warehouse's business, as determined in Lender's sole discretion;

(iv)     Inventory which is obsolete;

(v)     Inventory which Lender determines, in the exercise of its sole discretion, to be unacceptable due to age, type, category and/or quantity;

(vi)     Inventory with respect to which Lender does not have a first and valid fully perfected security interest; or

(vii)     Inventory which is stored with or located on the premises of a bailee, consignee, warehouseman, processor or other third party, other than a landlord who has executed and delivered a landlord lien waiver in form and substance reasonably acceptable to Lender.

"**Equipment**" shall have the meaning assigned to such term in the UCC.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall have the meaning specified in Section 15 hereof.

"**Fiscal Year**" shall mean each twelve (12) month accounting period of each Borrower, which ends in each case on December 31 of each year.

"**Fixtures**" shall have the meaning assigned to such term in the UCC.

"**Full Slab Inventory**" shall mean granite slabs at least fifty-five square feet in size.

"**General Intangibles**" shall have the meaning assigned to such term in the UCC.

"**Indemnified Party**" shall have the meaning specified in Section 17 hereof.

"**Instruments**" shall have the meaning assigned to such term in the UCC.

"**Inventory**" shall have the meaning assigned to such term in the UCC.

"**Investment Property**" shall have the meaning assigned to such term in the UCC.

"**Letter of Credit**" shall mean any Letter of Credit issued on behalf of any Borrower in accordance with this Agreement.

"**Letter-of-Credit Right**" shall have the meaning assigned to such term in the UCC.

"**Liabilities**" shall mean any and all obligations, liabilities and indebtedness of Borrowers to Lender or to any Affiliate of Lender of any and every kind and nature,

howsoever created, arising or evidenced and howsoever owned, held or acquired, whether now or hereafter existing, whether now due or to become due, whether primary, secondary, direct, indirect, absolute, contingent or otherwise (including without limitation obligations of performance), whether several, joint or joint and several, and whether arising or existing under written or oral agreement or by operation of law, including without limitation all obligations, liabilities and indebtedness of each Borrower under this Agreement.

"Loan" or "Loans" shall mean the Revolving Loans made by Lender to Borrowers pursuant to Section 2 hereof.

"Lock Box "and "Lock Box Account" shall have the meanings specified in Section 9 hereof.

"Obligor" shall mean each Borrower and each Person who is or shall become primarily or secondarily liable for any of the Liabilities, including without limitation the Owners and Eisenhower.

"Orozco" shall mean Tomas Orozco, an individual.

"Other Agreements" shall mean all agreements, instruments and documents, including without limitation guaranties, mortgages, trust deeds, pledges, powers of attorney, consents, assignments, security agreements, intercreditor agreements, financing statements and all other writings heretofore, now or from time to time hereafter executed by or on behalf of any Borrower or any other Person and delivered to Lender or to any Affiliate of Lender in connection with the Liabilities or the transactions contemplated hereby.

"Owners" shall mean Orozco, Biscaya and Verissimo.

"Permitted Liens" shall mean (i) statutory liens of landlords, carriers, warehousemen, mechanics, materialmen or suppliers incurred in the ordinary course of business and securing amounts not yet due, (ii) liens or security interests in favor of Lender, (iii) zoning restrictions and easements, licenses, covenants and other restrictions affecting the use of real property that do not individually or in the aggregate have a material adverse effect on Borrower's ability to use such real property for its intended purpose in connection with Borrower's business, (iv) liens that constitute purchase money security interests on any property securing indebtedness provided such indebtedness is permitted by Section 12(q) hereof, and (v) the liens set forth on Exhibit C.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party or foreign or United States government (whether federal, state, county, city, municipal or otherwise), including without limitation any instrumentality, division, agency, body or department thereof.

"Plan" shall mean any employee benefit plan defined in Section 3(3) of ERISA, including any multiemployer plan or any employee welfare benefit plan which is maintained or has been maintained pursuant to a collective bargaining agreement to which

two or more unrelated employers contribute and in respect of which a Borrower is an "employer" as defined in Section 3(5) of ERISA.

**"Proceeds"** shall have the meaning assigned to such term in the UCC.

**"PS Letter of Credit Obligations"** shall mean, as of any date of determination, the sum of (i) the aggregate undrawn face amount of all Letters of Credit issued on behalf of Pyramid Stone, and (ii) the aggregate unreimbursed amount of all drawn Letters of Credit issued on behalf of Pyramid Stone not already converted to Loans hereunder.

**"PS Maximum Revolving Loan Facility"** shall mean $2,000,000.

**"PS Revolving Loan Availability"** shall mean, at any time, the sum of the following:

(a) up to eighty-five percent (85%) of the face amount (less maximum discounts, credits and allowances which may be taken by or granted to Account Debtors in connection therewith) then outstanding under existing Eligible PS Accounts at such time, minus the sum of such amount multiplied by the Pyramid Stone Dilution Percentage, plus

(b) up to (i) eighty-five (85%) of the net orderly liquidation value of then-existing Eligible PS Full Slab Inventory and Eligible PS Tile Inventory, plus (ii) eighty-five percent (85%) of Eligible PS Remnant Inventory, valued at the net orderly liquidation value of such Remnant Inventory as set forth in the AccuVal Appraisal or any other appraisal of Remnant Inventory of Borrowers acceptable to Lender in its sole discretion plus (iii) the lesser of (A) $150,000 and (B) eighty-five percent (85%) of Eligible PS Tagged Inventory valued at ninety percent (90%) of actual cost, plus thirty percent (30%), which percentages may be amended from time to time in the sole discretion of the Lender upon the receipt by Lender of appraisals of such Inventory; minus

(c)      such reserves as Lender in its sole discretion elects to establish.

**"Purchase Program Availability Block"** shall mean as of any date of determination, an amount equal to one hundred percent (100%) of the cost of all Purchased Program Inventory of Stone Warehouse for which Loans have been advanced to purchase such Inventory as of such date minus the net orderly liquidation value of such Purchase Program Inventory as set forth in the AccuVal Appraisal or any other appraisal of Inventory of Borrower acceptable to Lender in its sole discretion.

**"Purchased Program Inventory"** shall mean Inventory owned by Stone Warehouse that otherwise satisfies the criteria for Eligible SW Full Slab Inventory but is in transit from any county acceptable to Lender in its sole discretion to any location listed on Exhibit B hereto so long as (a) such Inventory is delivered no later than one hundred twenty (120) days prior to the Termination Date from a vender approved in advance in writing by Lender and (b) Lender has possession of all bills of lading and other documents of title with

respect to such Inventory as well as any other documents or agreements Lender shall require in its sole discretion to perfect Lender's security interest therein.

"**Pyramid Stone Dilution Percentage**" shall mean seven and six tenths percent (7.6%), which percentage may be amended from time to time in the sole discretion of Lender.

"**Pyramid Stone Overadvance**" shall mean as of any date of determination, an Over Advance in excess of the PS Revolving Loan Availability equal to $175,000 on the date hereof, which amount will be reduced by $6,730.77 on each one week anniversary of the date hereof (commencing on the three week anniversary of the date hereof); provided that the Pyramid Stone Overadvance shall be reduced, on a dollar for dollar basis, for each dollar PS Revolving Loan Availability increases as a result of the Inventory of Pyramid Stone being appraised at a value in excess of the appraisal therefor in the AccuVal Appraisal as in effect on the date hereof and without giving effect to any amendments or other modifications thereto.

"**Reference Rate**" shall mean the "**Prime Rate**" of interest quoted from time to time, by JP Morgan Chase Bank, New York, New York. The Reference Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. In the event that JP Morgan Chase Bank, New York, New York ceases quoting the "Prime Rate" the Reference Rate shall be determined from a comparable index chosen by Lender in good faith. Any change in the Reference Rate shall be effective as of the date of the publication of any such change.

"**Remnant Inventory**" shall mean granite slabs less than fifty-five square feet in size but at least thirteen square feet in size.

"**Stone Warehouse Dilution Percentage**" shall mean two and eight tenths percent (2.8%), which percentage may be amended from time to time in the sole discretion of Lender.

"**Subsidiary**" shall mean any corporation of which more than fifty percent (50%) of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time stock of any other class of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned by a Borrower or by any partnership or joint venture of which more than fifty percent (50%) of the outstanding equity interests are at the time, directly or indirectly, owned by a Borrower.

"**SW Letter of Credit Obligations**" shall mean, as of any date of determination, the sum of (i) the aggregate undrawn face amount of all Letters of Credit issued on behalf of Stone Warehouse, and (ii) the aggregate unreimbursed amount of all drawn Letters of Credit issued on behalf of Stone Warehouse not already converted to Loans hereunder.

"**SW Maximum Revolving Loan Facility**" shall mean $3,000,000.

"**SW Revolving Loan Availability**" shall mean, at any time, the sum of the following:

      (a)    up to eighty-five percent (85%) of the face amount (less maximum discounts, credits and allowances which may be taken by or granted to Account Debtors in connection therewith) then outstanding under existing Eligible SW Accounts at such time, <u>minus</u> the sum of such amount multiplied by the Stone Warehouse Dilution Percentage, <u>plus</u>

      (b)    up to (i) eighty-five percent (85%) of the net orderly liquidation value of then-existing Eligible SW Full Slab Inventory, <u>plus</u> (ii) the lesser of (A) $400,000 and (B) eighty-five percent (85%) of Eligible SW Tagged Inventory valued at ninety percent (90%) of cost, plus thirty percent (30%) of cost, which percentages may be amended from time to time in the sole discretion of the Lender upon the receipt by Lender of appraisals of such Inventory; <u>plus</u> (iii) the lesser of (A) $500,000 and (B) one-hundred percent (100%) of the cost of Purchased Program Inventory; <u>minus</u>

      (c)    the Purchase Program Availability Block, if applicable; <u>minus</u>

      (d)    such reserves as Lender in its sole discretion elects to establish.

"**Tangible Chattel Paper**" shall have the meaning assigned to such term in the UCC.

"**Termination Date**" shall mean the earliest to occur of the following: (i) June 19, 2009 and (ii) the date the Liabilities are accelerated pursuant to Section 16 hereof.

"**Tile Inventory**" shall mean new granite tiles held for sale in the ordinary course of business of Pyramid Stone.

"**UCC**" shall mean the Uniform Commercial Code as in effect form time to time in the state of New York.

"**Verissimo**" shall mean Carlo Verissimo, an individual.

    2.    **LOANS.**

      (a) Subject to the terms and conditions of this Agreement and the Other Agreements, prior to the Termination Date, Lender may, in its sole discretion, make revolving loans (the "**PS Revolving Loans**") to Pyramid Stone as Pyramid Stone shall from time to time request. The aggregate unpaid principal of all PS Revolving Loans outstanding at any one time shall not exceed the lesser of (A) the PS Maximum Revolving Loan Facility minus PS Letter of Credit Obligations and (B) PS Revolving Loan Availability minus PS Letter of Credit Obligations at such time. If at any time (A) the outstanding principal balance of the PS Revolving Loans exceeds (i) the PS Maximum Revolving Loan Facility minus PS

Letter of Credit Obligations, (ii) the PS Revolving Loan Availability minus PS Letter of Credit Obligations or (B) any portion of PS Revolving Loans plus PS Letter of Credit Obligations exceeds any applicable sublimit within PS Revolving Loan Availability, Borrowers shall immediately, and without the necessity of a demand by Lender, pay to Lender such amount as may be necessary to eliminate such excess; provided however that on or before December 29, 2006, Pyramid Stone may maintain an overadvance equal to the Pyramid Stone Overadvance.

(b) Subject to the terms and conditions of this Agreement and the Other Agreements, prior to the Termination Date, Lender may, in its sole discretion, make revolving loans (the "SW Revolving Loans" and collectively with the PS Revolving Loans, "Revolving Loans") to Stone Warehouse as Stone Warehouse shall from time to time request. The aggregate unpaid principal of all SW Revolving Loans outstanding at any one time shall not exceed the lesser of (A) the SW Maximum Revolving Loan Facility minus SW Letter of Credit Obligations and (B) SW Revolving Loan Availability minus SW Letter of Credit Obligations at such time. If at any time (A) the outstanding principal balance of the SW Revolving Loans exceeds (i) the SW Maximum Revolving Loan Facility minus SW Letter of Credit Obligations, or (ii) the SW Revolving Loan Availability minus SW Letter of Credit Obligations or (B) any portion of SW Revolving Loans plus SW Letter of Credit Obligations exceeds any applicable sublimit within SW Revolving Loan Availability, Borrowers shall immediately, and without the necessity of a demand by Lender, pay to Lender such amount as may be necessary to eliminate such excess.

(c) The Revolving Loans shall, in Lender's sole discretion, be evidenced by one or more promissory notes in form and substance satisfactory to Lender. However, if the Revolving Loans are not so evidenced, such Loans may be evidenced solely by entries upon the books and records maintained by Lender. Principal of the Revolving Loans shall be payable in full on the Termination Date.

(d) Concurrently with the receipt of any proceeds of (i) the sale or other disposition of any material asset of any Borrower outside the ordinary course of business, (ii) the issuance of indebtedness or equity securities by any Borrower or (iii) insurance or condemnation awards, such proceeds shall be paid by the applicable Borrower to Lender as a mandatory prepayment of the Loans to be applied against the then outstanding Liabilities, as determined by Lender in its sole discretion.

3.    **LETTERS OF CREDIT.**

(a) Subject to the terms and conditions of this Agreement and the Other Agreements, Lender may, in its sole discretion, from time to time cause to be issued and co-sign for or otherwise guarantee, (i) upon either Borrowers' request, commercial and/or standby Letters of Credit (provided, that the aggregate undrawn face amount of all such Letters of Credit shall at no time exceed $250,000) or (ii) upon Stone Warehouse's request, commercial Letters of Credit to purchase Purchase Program Inventory (provided, that the aggregate undrawn face amount of all such Letters of Credit for Purchase Program Inventory shall at no time exceed $500,000). Payments made by the issuer of a Letter of

-14-

Credit to any Person on account of any Letter of Credit shall be immediately payable by the applicable Borrower without notice, presentment or demand and each Borrower agrees that each payment made by the issuer of a Letter of Credit in respect of a Letter of Credit shall constitute a request by the applicable Borrower for a Loan to reimburse such issuer. In the event such Loan is not advanced by Lender for any reason, such reimbursement obligations (whether owing to the issuer of the Letter of Credit or Lender if Lender is not the issuer) shall become part of the Liabilities hereunder and shall bear interest at the rate then applicable to Revolving Loans until repaid. Borrowers shall remit to Lender a Letter of Credit fee equal to one and one half percent (1.5%) on the aggregate daily stated amount of all Letters of Credit outstanding, which fee shall be payable monthly in advance. Borrowers shall also pay on demand the normal and customary administrative charges of the issuer of the Letter of Credit for documentation, issuance, amendment, negotiation, transfer, drawings, processing, renewal or extension of any Letter of Credit.

(b) A Borrower shall make requests for Letters of Credit in writing at least two (2) business days prior to the date such Letter of Credit is to be issued. Each such request shall specify the date such Letter of Credit is to be issued, the amount thereof, the name and address of the beneficiary thereof and a description of the transaction to be supported thereby. Any such notice shall be accompanied by the form of Letter of Credit requested and any application or reimbursement agreement required by the issuer of such Letter of Credit. If any term of such application or reimbursement agreement is inconsistent with this Agreement, then the provisions of this Agreement shall control to the extent of such inconsistency.

(c) Borrowers shall be obligated to reimburse the issuer of any Letter of Credit, or Lender if Lender has reimbursed such issuer on any Borrower's behalf, for any payments made in respect of any Letter of Credit, which obligation shall be unconditional and irrevocable and shall be paid regardless of: (i) any lack of validity or enforceability of any Letter of Credit, (ii) any amendment or waiver of or consent or departure from all or any provisions of any Letter of Credit, this Agreement or any Other Agreement, (iii) the existence of any claim, set off, defense or other right which any Borrower or any other Person may have against any beneficiary of any Letter of Credit, Lender or the issuer of the Letter of Credit, (iv) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid, or insufficient in any respect or any statement therein being untrue or inaccurate in any respect, (v) any payment under any Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, and (vi) any other act or omission to act or delay of any kind of the issuer of such Letter of Credit, Lender or any other Person or any other event or circumstance that might otherwise constitute a legal or equitable discharge of any Borrower's obligations hereunder. It is understood and agreed by Borrowers that the issuer of any Letter of Credit may accept documents that appear on their face to be in order without further investigation or inquiry, regardless of any notice or information to the contrary.

(d) The expiration date of each Letter of Credit shall be no later than the earlier of (i) one-hundred twenty (120) days from the date of issuance and (ii) the sixtieth (60th) business day prior to the Termination Date.

4.    **INTEREST, FEES AND CHARGES.**  Borrowers shall pay to Lender the following:

(a) Borrowers shall pay to Lender interest on the outstanding principal balance of the Loans monthly in arrears on the first day of each month beginning on date hereof, at the per annum rate of one and one-half percent (1.5%) plus the Reference Rate. Following the occurrence of an Event of Default, Borrowers shall pay to Lender interest on the outstanding principal balance of the Loans at the per annum rate of three and one half percent (3.5%) plus the Reference Rate (which rate shall increase to eight and one half percent (8.5%) if the applicable Event of Default is not cured within forty-five (45) days thereof); provided, that Borrower shall have fourteen (14) days before the imposition of such default interest rate to cure any Event of Default other than an Event of Default arising from a breach of Section 14.

(b) Borrowers shall pay to Lender a closing fee the amount of $18,750 which shall be fully earned as of and payable on the date hereof.

(c) Borrowers shall pay to Lender an unused line fee of 3/8 of one percent (0.375%) of the difference between (i) the PS Maximum Revolving Loan Facility plus the SW Maximum Revolving Loan Facility and (ii) the average daily balance of the Revolving Loans plus the PS Letter of Credit Obligations and the SW Letter of Credit Obligations for each month, which fee shall be fully earned by Lender and payable monthly in arrears on the first business day of each month.

(d) Borrowers shall pay to Lender a monthly administrative fee equal to $3,000.00, which fee shall be fully earned by Lender and payable on the date that Lender makes its initial disbursement under this Agreement and on each month anniversary of the date hereof.

Each Borrower hereby authorizes Lender to make Revolving Loans, at any time in its sole discretion, (x) as provided in Section 3(a), with respect to obligations arising under Letters of Credit, and (y) to pay interest, fees, expenses and other charges of any Borrower from time to time arising under this Agreement or any Other Agreement; provided, that Lender shall have no obligation at any time to make any Revolving Loan pursuant to the provisions of the preceding sub-clause (y).  Lender shall have the right to make Revolving Loans pursuant to the provisions of this paragraph regardless of whether the conditions precedent set forth in Section 5(a) are then satisfied, including the existence of any Event of Default either before or after giving effect to the making of such Revolving Loans.

Interest and fees shall be computed on the basis of a year of three hundred sixty (360) days for the actual number of days elapsed.  It is the intent of the parties that the rate of interest and the other fees and charges to Borrowers under this Agreement shall be lawful; therefore, if for

any reason the interest or other fees and charges payable under this Agreement are found by a court of competent jurisdiction, in a final determination, to exceed the limit which Lender may lawfully charge Borrowers, then the obligation to pay interest and other charges shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid, then such amount shall be refunded to Borrowers.

### 5. CONDITIONS OF ADVANCES.

(a) Without limiting Lender's discretion to make advances hereunder, the making of any advance provided for in this Agreement shall be conditioned upon the following:

(i)    Lender shall have received, by at least noon (12:00 p.m.) New York time on the day on which an advance is requested to be made hereunder, a written notice of borrowing in the form of Exhibit J attached hereto from an officer of the applicable Borrower (or any Person authorized by such Borrower pursuant to a written list provided to Lender), for an advance in a specific amount;

(ii)    No Event of Default shall have occurred and be continuing or be caused by the making of such advance;

(iii)    All of the representations and warranties contained in this Agreement and the Other Agreements shall be true and correct (in all material respects solely for advances made after the date hereof) as if made on the date the request for an advance is made except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties are true and correct (in all material respects solely for advances made after the date hereof) as of such earlier date; and

(b) The obligation of Lender to fund the Loans on the date hereof and to issue or cause to be issued initial Letters of Credit on the date hereof, is subject to the satisfaction of or waiver on or before the date hereof of the following additional conditions precedent:

(i)    Lender shall have received, in form and substance reasonably satisfactory to Lender, all certificates, orders, authorities, consents, affidavits, schedules, instruments, security agreements, financing statements, mortgages, subordination agreements, guaranties and other documents set forth on the closing list, attached hereto as Exhibit I, or which Lender may at any time request;

(ii)    Since April 30, 2006, no event shall have occurred which has had or could reasonably be expected to have a material adverse effect on the financial condition, operations, assets, business or properties of any Borrower, any Owner or Eisenhower;

(iii)    Lender shall have received, in form and substance reasonably satisfactory to Lender, (A) a satisfactory field examination of the assets of Borrowers,

Owners and Eisenhower and (B) evidence of the final clean up of all Accounts of Borrowers;

(iv)  Lender shall have received, in form and substance reasonably satisfactory to Lender, monthly and quarterly financial statements as well as a pre-closing sources and uses statement;

(v)  Lender shall have received, in form and substance satisfactory to Lender, (A) monthly financial statements for the period ending April 30, 2006 and (B) an operating budget covering the 2006, 2007 and 2008 fiscal years certified by the Owners and Chief Financial Officer of Borrowers, to be prepared showing annual calculations for each fiscal year and quarterly and monthly calculations for the 2006 fiscal year;

(vi)  Lender shall have received all of its costs, fees and expenses, including without limitation reasonable attorney fees, incurred by Lender in connection with the execution of this Agreement and the consummation of the transactions related thereto; provided that Lender acknowledges receipt a deposit from the Borrowers in the amount of $17,000.00 and agrees that such deposit shall be applied to Lender's costs, fees and expenses required to be paid pursuant to this clause (vi);

(vii)  Lender shall have received, in form and substance reasonably satisfactory to Lender, evidence that all taxes owing by any Borrower, any Owner or Eisenhower on or prior to the date hereof have been paid;

(viii)  Lender shall have received, in form and substance satisfactory to Lender, (A) a credit report and background checks concerning each of each Borrower, each Owner and Eisenhower and (B) copies of passports and drivers licenses of each Owner; and

(ix)  Lender shall have received all of the schedules and reports required to have been delivered by Borrower pursuant to Section 10 hereof, dated as of the date hereof.

(c)  As an accommodation to the Borrowers, Lender has agreed to execute this Agreement and to make Loans hereunder notwithstanding that certain conditions to closing have not been satisfied. In consideration of such accommodation, (i) within sixty (60) days of the date hereof and at his sole cost and expense, Verissimo agrees to deliver a real estate appraisal (prepared by an appraiser acceptable to Lender and in form and substance satisfactory to Lender) for the premises located at 14 South Yorkshire Woods, Oakbrook, Illinois 60523 and (ii) within forty five (45) days of the date hereof and at its sole cost and expense, Stone Warehouse agrees to cause a Landlord's Waiver in form and substance acceptable to Lender (and containing, among other things, a right to sell collateral on the premises and a 90 day access period on the premises) to be executed and delivered by the landlord of the premises located at 70 Eisenhower Lane North, Lombard, Illinois and 301-303 Eisenhower Lane South, Lombard, Illinois (it being agreed and

understood that the failure to comply with the requirements set forth in this Section 5(c)(ii) (A) will result in the institution of a reserve against PS Revolving Loan Availability and SW Revolving Loan Availability in an amount determined by Lender in its sole discretion, and (B) shall not constitute an "Event of Default" unless so declared by Lender in writing).

6. **GRANT OF SECURITY INTEREST TO LENDER.** As security for the payment or other satisfaction of all Liabilities, each Borrower hereby assigns to Lender and grants to Lender a continuing security interest in the following property of such Borrower, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located: (a) all Accounts and all Goods whose sale, lease or other disposition by such Borrower has given rise to Accounts and have been returned to or repossessed or stopped in transit by such Borrower; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including without limitation all patents, patent applications, trademarks, trademark applications, tradenames, trade secrets, goodwill, copyrights, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contracts rights, payment intangibles, security interests, security deposits and any rights to indemnification); (c) all Inventory and other Goods, including without limitation Equipment, vehicles and Fixtures; (d) all Investment Property; (e) all Deposit Accounts, bank accounts, deposits and cash (f) all Letter-of-Credit Rights; (g) Commercial Tort Claims listed on Exhibit H hereto; (h) any other property of Borrower now or hereafter in the possession, custody or control of Lender or any agent or any Affiliate of Lender or any participant with Lender in the Loans for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise); and (i) all additions and accessions to, substitutions for, and replacements, products and proceeds of the foregoing property, including without limitation proceeds of all insurance policies insuring the foregoing property, and all of such Borrower's books and records relating to any of the foregoing and to such Borrower's business.

7. **PRESERVATION OF COLLATERAL AND PERFECTION OF SECURITY INTERESTS THEREIN.**

(a) Each Borrower shall, at Lender's request, at any time and from time to time, authenticate, execute and deliver to Lender such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Lender) and do such other acts and things or cause third parties to do such other acts and things as Lender may deem reasonably necessary or desirable in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Lender (free and clear of all other liens, claims and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens) to secure payment of the Liabilities, and in order to facilitate the collection of the Collateral. Each Borrower irrevocably hereby makes, constitutes and appoints Lender (and all Persons designated by Lender for that purpose) as such Borrower's true and lawful attorney and agent-in-fact to execute such financing statements, documents and other agreements and instruments and do such other acts and things as may be reasonably necessary to preserve and perfect Lender's security interest in the Collateral.

-19-

(b) Immediately upon any Borrower's receipt of any portion of the Collateral evidenced by an Instrument or Document including, without limitation, any Tangible Chattel Paper and any Investment Property consisting of certificated securities, such Borrower shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance acceptable to Lender). If any endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized as the applicable Borrower's attorney and agent-in-fact, to endorse or assign the same on such Borrower's behalf.

(c) To the extent any Borrower obtains or maintains any Electronic Chattel Paper, Deposit Accounts or Letter-of-Credit Rights, such Borrower shall do such acts and things or cause third parties to do such acts and things to establish control in favor of Lender as control for such type of Collateral is defined in the UCC.

8.    **CAPITAL ADEQUACY.** If Lender shall reasonably determine that the application or adoption of any law, rule, regulation, directive, interpretation, treaty or guideline regarding capital adequacy, or any change therein or in the interpretation or administration thereof, whether or not having the force of law, increases the amount of capital required or expected to be maintained by Lender or any Person controlling, directly or indirectly, Lender, and such increase is based upon the existence of Lender's obligations hereunder and other commitments of this type, then from time to time, within ten (10) days after demand from Lender, Borrowers shall pay to Lender such amount or amounts as will compensate Lender or such controlling Person, as the case may be, for such increased capital requirement. The determination of any amount to be paid by Borrowers under this Section 8 shall take into consideration the policies of Lender or any Person controlling Lender with respect to capital adequacy and shall be based upon any reasonable averaging, attribution and allocation methods selected by Lender. A certificate of Lender setting forth the amount or amounts as shall be necessary to compensate Lender as specified in this Section 8 shall be delivered to Borrowers and shall be conclusive in the absence of manifest error.

9.    **COLLECTIONS.**

(a) Each Borrower shall direct all of its Account Debtors to make all payments on the Accounts to a post office box (the **"Lock Box"**) designated by, and under the exclusive control of a financial institution acceptable to Lender. Borrowers shall establish an account (the **"Lock Box Account"**) in Borrowers' name with such other financial institution acceptable to Lender, into which all payments received in the Lock Box shall be deposited, and into which each Borrower will immediately deposit all payments received by such Borrower with respect to Accounts of such Borrower and other Collateral in the identical form in which such payments were made, whether by cash or check. If any Borrower, any Affiliate or Subsidiary of a Borrower, or any shareholder, officer, director, employee or agent of a Borrower or any Affiliate or Subsidiary of a Borrower, or any other Person acting for or in concert with a Borrower shall receive any monies, checks, notes, drafts or other payments relating to or as Proceeds of Accounts of any Borrower or other Collateral, such Borrower and each such Person shall receive all such items in trust for, and

as the sole and exclusive property of, Lender and, immediately upon receipt thereof, shall remit the same (or cause the same to be remitted) in kind to the Lock Box Account. The financial institution with which the Lock Box Account is established shall acknowledge and agree, in a manner satisfactory to Lender, that the amounts on deposit in such Lock Box Account are the sole and exclusive property of Lender, that such financial institution will follow the instructions of Lender with respect to disposition of funds in the Lock Box and Lock Box Account without further consent from any Borrower, that such financial institution has no right to setoff against the Lock Box Account or against any other account maintained by such financial institution into which the contents of the Lock Box Account are transferred, and that such financial institution shall wire to Lender, or otherwise transfer to Lender in immediately available funds in a manner satisfactory to Lender, funds deposited in the Lock Box Account on a daily basis as such funds are collected. For purposes of calculating interest on the Liabilities, Lender shall, one business day after receipt by Lender of good Funds via wire transfer or sweep from the Lock Box Account (and two business days after receipt by Lender of good Funds via check), apply (conditional upon final collection) the whole or any part of such collections or Proceeds against the Liabilities in such order as Lender shall determine in its sole discretion. For purposes of calculating the amount of Revolving Loans available to any Borrower, such payments will be applied (conditional upon final collection) to the Liabilities on the next business day after receipt by Lender of such funds in the Lock Box Account. Each Borrower agrees that all payments deposited to such Lock Box Account or otherwise received by Lender, whether in respect of the Accounts of such Borrower or as Proceeds of other Collateral or otherwise, will be applied on account of the Liabilities in accordance with the terms of this Agreement. All checks, drafts, instruments and other items of payment or Proceeds of Collateral shall be endorsed by each Borrower to Lender, and, if that endorsement of any such item shall not be made for any reason, Lender is hereby irrevocably authorized to endorse the same on any Borrower's behalf. For the purpose of this Section 9, each Borrower irrevocably hereby makes, constitutes and appoints Lender (and all Persons designated by Lender for that purpose) as such Borrower's true and lawful attorney and agent-in-fact (i) to endorse such Borrower's name upon said items of payment and/or Proceeds of Collateral and upon any Tangible Chattel Paper of any Borrower, document, instrument, invoice or similar document or agreement relating to any Account of any Borrower or goods pertaining thereto; (ii) to take control in any manner of any item of payment or proceeds thereof; and (iii) to have access to any lock box or postal box into which any of any Borrower's mail is deposited, and open and process all mail addressed to any Borrower and deposited therein.

(b) Lender may, at any time and from time to time provided that an Event of Default has occurred and is continuing, whether before or after notification to any Account Debtor and whether before or after the maturity of any of the Liabilities, (i) enforce collection of any of any Borrowers' Accounts or contract rights by suit or otherwise; (ii) exercise all of any Borrower's rights and remedies with respect to proceedings brought to collect any Accounts of any Borrower; (iii) surrender, release or exchange all or any part of any Accounts of any Borrower, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder; (iv) sell or assign any Account of any Borrower upon such terms, for such amount and at such time or times as

Lender deems advisable; (v) prepare, file and sign any Borrower's name on any proof of claim in bankruptcy or other similar document against any Account Debtor; and (vi) do all other acts and things which are necessary, in Lender's sole discretion, to fulfill Borrower's obligations under this Agreement and to allow Lender to collect the Accounts of any Borrower. In addition to any other provision hereof, Lender may at any time, after the occurrence of an Event of Default, at Borrowers' expense, notify any parties obligated on any of the Accounts to make payment directly to Lender of any amounts due or to become due thereunder.

(c) Lender, in its sole discretion, without waiving or releasing any obligation, liability or duty of any Borrower under this Agreement or the Other Agreements or any Event of Default, may at any time or times hereafter, but shall not be obligated to, pay, acquire or accept an assignment of any security interest, lien, encumbrance or claim asserted by any Person in, upon or against the Collateral. All sums paid by Lender in respect thereof and all costs, fees and expenses, including without limitation reasonable attorney fees, all court costs and all other charges relating thereto incurred by Lender shall be netted against the most recent administrative fee paid by Borrowers pursuant to Section 4(d) until such amount is zero and thereafter, such fees, costs and other charges shall constitute Revolving Loans, payable by Borrowers to Lender on demand and, until paid, shall bear interest at the highest rate then applicable to Revolving Loans hereunder.

10.    **SCHEDULES AND REPORTS.**

(a) At the end of each calendar week, upon each request for a Loan hereunder and at such other times as may be requested by Lender from time to time hereafter, each Borrower shall deliver to Lender (i) a borrowing base certificate certified by the Chief Financial Officer of such Borrower, which certificate includes schedule identifying each Eligible Account of such Borrower together with a detailed perpetual inventory report (by location and product codes); and (ii) such additional schedules, certificates, reports and information with respect to the Collateral as Lender may from time to time require, including, without limitation, copies of the invoices (with evidence of shipment attached) pertaining to each such Eligible Account as well as daily sales, collections, cash receipts, credit and adjustment reports and all appropriate supporting documentation, and a certification of the composition, quantity and value of the Eligible Inventory of such Borrower for the month or week (or other applicable period) immediately preceding, as well as evidence of cost and market prices of such Inventory (with cost determined on a first-in, first-out method), with all appropriate supporting documentation. Lender, through its officers, employees or agents, shall have the right, at any time and from time to time in Lender's name, in the name of a nominee of Lender or in any Borrower's name, to verify the validity, amount or any other matter relating to any of any Borrower's Accounts, by mail, telephone, telegraph or otherwise. Borrowers shall reimburse Lender, on demand, for all costs, fees and expenses incurred by Lender in this regard. Borrowers shall immediately notify Lender of any event causing loss or depreciation in value of any Borrower's Inventory (other than normal depreciation occurring in the ordinary course of business). Such weekly reports may be submitted by telecopy, with originals to follow by U.S. Mail.

(b) Without limiting the generality of the foregoing, each Borrower shall deliver to Lender, at least once a month, not later than the twentieth (20th) day of each month (or more frequently when requested by Lender), a month-end borrowing base certificate, certified by the Chief Financial Officer of such Borrower which reconciles to all month-end financial reports, an accounts receivable aging report (aged by invoice date), an accounts payable aging report (aged by invoice date), a detailed perpetual inventory report (by location and product codes) and all appropriate supporting documentation.

(c) All schedules, certificates, reports, and assignments and other items delivered by each Borrower to Lender hereunder shall be executed by an authorized representative of such Borrower and shall be in such form and contain such information as Lender shall reasonably specify.

## 11. TERMINATION.

(a) This Agreement shall be in effect until the Termination Date. The security interests and liens created under this Agreement and the Other Agreements shall survive such termination until the payment of the Liabilities has become indefeasible. At such time as Borrowers have repaid all of the Liabilities and this Agreement has terminated, each Borrower shall deliver to Lender a release, in form and substance satisfactory to Lender, of all obligations and liabilities of Lender and its officers, directors, employees, agents and Affiliates to such Borrower.

(b) If, prior to the Termination Date, Borrowers prepay the Liabilities in full and terminates their obligations hereunder or permanently reduce, in whole or in part, the commitment to provide Revolving Loans hereunder, in view of the impracticality and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties, Borrowers agree to pay to Lender, upon such prepayment, an early termination fee equal to the amount set forth below if such prepayment occurs during the period indicated:

| Amount | Period |
|--------|--------|
| $50,000 | From date hereof to and including the date of the first anniversary of this Agreement |
| $30,000 | After the date of the first anniversary of this Agreement to and including the date of the second anniversary of this Agreement. |

The early termination fee shall be deemed included in the Liabilities.

## 12. REPRESENTATIONS, WARRANTIES AND COVENANTS. Each Borrower hereby represents, warrants and covenants that:

(a) the financial statements delivered or to be delivered by Borrowers to Lender at or prior to the date of this Agreement and at all times subsequent thereto accurately reflect the financial condition of each Borrower in all material respects, and there has been no

adverse change in the financial condition, the operations or any other status of any Borrower since the date of the financial statements delivered to Lender most recently prior to the date of this Agreement;

(b) the office where each Borrower keeps its books, records and accounts (or copies thereof) concerning the Collateral, each Borrower's principal place of business and all of each Borrower's other places of business, locations of Collateral and post office boxes are as set forth in Exhibit B; each Borrower shall promptly (but in no event less than ten (10) days prior thereto) advise Lender in writing of the proposed opening of any new place of business, the closing of any existing place of business, any change in the location of such Borrower's books, records and accounts (or copies thereof) or the opening or closing of any post office box of such Borrower;

(c) the Collateral, including without limitation the Equipment (except any part thereof which prior to the date of this Agreement Borrowers shall have advised Lender in writing consists of Collateral normally used in more than one state) is and shall be kept, or, in the case of vehicles, based, only at the addresses set forth on the first page of this Agreement or on Exhibit B;

(d) if any of the Collateral consists of Goods of a type normally used in more than one state, whether or not actually so used, Borrowers shall promptly and, in any event, within two (2) business days give written notice to Lender of any use of any such Goods in any state other than a state in which such Borrower has previously advised Lender such Goods shall be used, and such Goods shall not, unless Lender shall otherwise consent in writing, be used outside of the continental United States;

(e) each Account or item of Inventory which Borrowers shall, expressly or by implication, request Lender to classify as an Eligible Account or as Eligible Inventory, respectively, shall, as of the time when such request is made, conform in all respects to the requirements of such classification as set forth in the respective definitions of "**Eligible Account**" and "**Eligible Inventory**" as set forth herein and as otherwise established by Lender from time to time, and Borrowers shall promptly notify Lender in writing if any such Eligible Account or Eligible Inventory shall subsequently become ineligible;

(f) each Borrower is and shall at all times be the lawful owner of its property now purportedly owned or hereafter purportedly acquired by such Borrower, free from all liens, claims, security interests and encumbrances whatsoever, whether voluntarily or involuntarily created and whether or not perfected, other than the Permitted Liens;

(g) each Borrower has the right and power and is duly authorized and empowered to enter into, execute and deliver this Agreement and the Other Agreements and perform its obligations hereunder and thereunder; each Borrower's execution, delivery and performance of this Agreement and the Other Agreements does not and shall not conflict in any material respect with the provisions of any statute, regulation, ordinance or rule of law, or any agreement, contract or other document which may now or hereafter be binding on such Borrower, and such Borrower's execution, delivery and performance of this Agreement

and the Other Agreements shall not result in the imposition of any lien or other encumbrance upon any of such Borrower's property under any existing indenture, mortgage, deed of trust, loan or credit agreement or other agreement or instrument by which such Borrower or any of its property may be bound or affected other than Liens granted to Lender hereunder;

(h) Exhibit K hereto sets forth all actions or proceedings which are pending or, to such Person's knowledge, threatened against any Borrower or other Obligor, and there are no actions or proceedings which might result in any material adverse change in its financial condition or materially adversely affect such Borrower's or other Obligor's property and each Borrower or other Obligor shall, promptly upon becoming aware of any such pending or threatened action or proceeding, give written notice thereof to Lender;

(i) no Borrower has any Commercial Tort Claims pending other than those set forth on Exhibit H hereto, as Exhibit H may be amended from time to time, and each Borrower shall, promptly upon becoming aware of any Commercial Tort Claims which may arise, notify Lender of such Commercial Tort Claims, which notice shall constitute such Borrower's authorization to amend Exhibit H to add such Commercial Tort Claim.

(j) each Borrower has obtained all licenses, authorizations, approvals and permits, the lack of which would have a material adverse effect on the operation of its business, and each Borrower is and shall remain in compliance in all material respects with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, statutes, orders, regulations, rules, and ordinances relating to taxes, securities, employee health and safety and environmental matters), the failure to comply with which would have a material adverse effect on its business, property, assets, operations or condition, financial or otherwise;

(k) all written information now, heretofore or hereafter furnished by any Borrower to Lender is and shall be true and correct as of the date with respect to which such information was or is furnished;

(l) no Borrower is conducting, permitting or suffering to be conducted, nor shall it conduct, permit or suffer to be conducted, any activities or transactions with any Affiliate of any Borrower; provided, however, that (i) such Borrower may enter into transactions with Affiliates of such Borrower in the ordinary course of business pursuant to terms that are no less favorable to such Borrower than the terms upon which such transfers or transactions would have been made had they been made to or with a Person that is not an Affiliate of such Borrower and, in connection therewith, may transfer cash or property to Affiliates of such Borrower for fair value, (ii) Pyramid Stone may purchase Full Slab Inventory from Stone Warehouse for a purchase price of not less than ten percent (10%) over the cost of Stone Warehouse therefor and not more than the purchase price of comparable Full Slab Inventory from a Person that is not an Affiliate of Borrowers and (iii) Pyramid Stone may issue and Stone Warehouse may accept an intercompany note in form and substance satisfactory to Lender;

(m) each Borrower's name has been as set forth on the first page of this Agreement for the past five (5) years and no Borrower uses tradenames or division names in the operation of its business, except as set forth on Exhibit D; each Borrower shall notify Lender in writing within ten (10) days of the change of its name or the use of any tradenames or division names not previously disclosed to Lender in writing;

(n) with respect to each Borrower's Equipment: (i) such Borrower has good and indefeasible and merchantable title to and ownership of all Equipment, including without limitation the Equipment described on Exhibit E; (ii) such Borrower shall keep and maintain the Equipment in good operating condition and repair and shall make all necessary replacements thereof and renewals thereto so that the value and operating efficiency thereof shall at all times be preserved and maintained; (iii) such Borrower shall not permit any such items to become a Fixture to real estate or an accession to other personal property; and (iv) such Borrower, promptly and, in any event, within two (2) business days of demand by Lender, shall deliver to Lender any and all evidence of ownership of, including without limitation certificates of title and applications of title to, any of the Equipment;

(o) this Agreement and the Other Agreements to which each Borrower is a party are the legal, valid and binding obligations of such Borrower and are enforceable against such Borrower in accordance with their respective terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors rights generally and to general principles of equity;

(p) each Borrower is solvent, is able to pay its debts as they become due and has capital sufficient to carry on its business, now owns property having a value both at fair valuation and at present fair saleable value greater than the amount required to pay its debts, and will not be rendered insolvent by the execution and delivery of this Agreement or any of the Other Agreements or by completion of the transactions contemplated hereunder or thereunder;

(q) no Borrower is now obligated, nor shall it create, incur, assume or become obligated (directly or indirectly), for any loans or other indebtedness for borrowed money other than the Loans, nor shall it declare, pay, make or set aside any amount for payment in respect of any indebtedness subordinated to the Loans except that a Borrower may (i) borrow money from either Owner on an unsecured and subordinated basis if a subordination agreement in favor of Lender and in form and substance satisfactory to Lender is executed and delivered to Lender relative thereto; (ii) maintain any present indebtedness to any Person which is set forth on Exhibit F; (iii) incur unsecured indebtedness to trade creditors in the ordinary course of such Borrower's business, (iv) Pyramid Stone may borrow money from Stone Warehouse pursuant to a subordinated intercompany note in form and substance satisfactory to Lender, (v) so long as no Event of Default exists hereunder, Pyramid Stone may make regularly scheduled payments of principal and interest (but no voluntary prepayments) in respect of such subordinated intercompany note made in full compliance with any and all subordination provisions applicable to such subordinated intercompany note in an amount not to exceed $1,900 per week, and (vi) incur

indebtedness of up to $25,000 incurred for the purpose of financing all or any part of the cost of acquiring property subject to a purchase money security interest;

(r) no Borrower owns any margin securities, and none of the proceeds of the Loans hereunder shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase any margin securities or for any other purpose not permitted by Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time;

(s) Exhibit G sets forth the names of all of the equityholders of each Borrower and except as set forth on Exhibit G, no Borrower has any Subsidiaries or divisions, nor is any Borrower engaged in any joint venture or partnership with any other Person;

(t) each Borrower is duly organized and in good standing in the State of Illinois, Stone Warehouse's organizational identification number is 57830786, Pyramid Stone's organizational identification number is 00660175 and each Borrower is duly qualified and in good standing in all states where the nature and extent of the business transacted by it or the ownership of its assets makes such qualification necessary;

(u) no Borrower is in default under any material contract, lease or commitment to which it is a party or by which it is bound, nor does any Borrower know of any dispute regarding any contract, lease or commitment which is material to the continued financial success and well-being of any Borrower;

(v) there are no controversies pending or, to any Borrower's knowledge, threatened between any Borrower and any of its employees, other than employee grievances arising in the ordinary course of business which are not, in the aggregate, material to the continued financial success and well-being of such Borrower, and each Borrower is in compliance in all material respects with all federal and state laws respecting employment and employment terms, conditions and practices; and

(w) each Borrower possesses, and shall continue to possess, adequate licenses, patents, patent applications, copyrights, service marks, trademarks, trademark applications, tradestyles and tradenames to continue to conduct its business as heretofore conducted by it.

Each Borrower represents, warrants and covenants to Lender that all representations and warranties of such Borrower contained in this Agreement (whether appearing in Section 12 or 13 hereof or elsewhere) shall be true at the time of each Borrower's execution of this Agreement, shall survive the execution, delivery and acceptance hereof by the parties hereto and the closing of the transactions described herein or related hereto, shall remain true in all material respects until the repayment in full of all of the Liabilities and termination of this Agreement, and shall be remade by each Borrower at the time each Loan is made pursuant to this Agreement except to the extent that such representation and warranty specifically relates to an earlier date, in which case it shall remain true and correct in all material respects as of such earlier date.

13.  **ADDITIONAL COVENANTS OF BORROWERS.** Until payment or satisfaction in full of all Liabilities and termination of this Agreement, unless Borrowers obtain Lender's prior written consent waiving or modifying any of any Borrower's covenants hereunder in any specific instance, each Borrower agrees as follows:

(a) Each Borrower shall at all times keep accurate and complete books, records and accounts with respect to all of such Borrower's business activities, in accordance with sound accounting practices and generally accepted accounting principles consistently applied (including without limitation the appropriate dating of checks to vendors of Borrowers), and shall keep such books, records and accounts, and any copies thereof, only at the addresses indicated for such purpose on Exhibit B;

(b) Borrowers agree to deliver to Lender the following financial information, all of which shall be prepared in accordance with generally accepted accounting principles consistently applied: (i) no later than twenty (20) days after each calendar month, copies of internally prepared monthly and, when applicable, quarterly financial statements, including without limitation balance sheets and statements of income, retained earnings and cash flow of Borrowers, with a Compliance Certificate in the form of Exhibit I hereto, certified by the Owners and Chief Financial Officer of each Borrower and including comparisons to the budget most recently delivered by Borrowers to Lenders and prior comparable periods therein, as well as detailed accounts payable and accounts receivable agings, in each case, reasonably satisfactory to Lender; (ii) no later than one hundred twenty (120) days after the end of each of Borrowers' fiscal years, annual financial statements certified by independent certified public accountants selected by Borrowers and reasonably satisfactory to Lender (and Borrowers agree to request in writing at the time such accountants are engaged and shall use other commercially reasonable efforts to cause such financial statements to be accompanied by a letter from such accountants acknowledging that they are aware that Lender is relying upon such financial statements in connection with the exercise of its rights hereunder) and a Compliance Certificate certified by the Owners and Chief Financial Officer of Borrowers and including comparisons to the budget most recently delivered by Borrowers to Lender and prior comparable periods therein; (iii) no later than the thirty (30) days before the beginning of each fiscal year, Borrowers shall deliver to Lender an operating budget for such fiscal year, to be prepared showing annual, quarterly and monthly calculations certified by the Owners and Chief Financial Officer of Borrowers; (iv) within ten (10) days after the filing thereof, copies of each Obligor's United States income tax returns; and (iv) such other financial information as Lender shall reasonably request;

(c) Each Borrower shall promptly advise Lender in writing of any material adverse change in the business, assets or condition, financial or otherwise, of Borrower, the occurrence of any Event of Default hereunder or the occurrence of any event which, if uncured, will become an Event of Default hereunder after notice or lapse of time (or both);

(d) Lender, or any Persons designated by it, shall have the right, at any time, to call at each Borrower's places of business at any reasonable times, and, without hindrance or delay, to inspect and audit the Collateral and to inspect, audit, check and make extracts from any Borrower's books, records, journals, orders, receipts and any correspondence and

other data relating to any Borrower's business, the Collateral or any transactions between the parties hereto, and shall have the right to make such verification concerning any Borrower's business as Lender may consider reasonable under the circumstances provided that Lender shall provide 48 hours' prior notice of any such inspection or audit if no Event of Default exists. Each Borrower shall furnish to Lender such information relevant to Lender's rights under this Agreement as Lender shall at any time and from time to time request. Each Borrower authorizes Lender to discuss the affairs, finances and business of such Borrower with any officers, employees or directors of such Borrower or with any Affiliate or the officers, employees or directors of any Affiliate, and to discuss the financial condition of any Borrower with such Borrower's independent public accountants. Any such discussions shall be without liability to Lender or to such Borrower's independent public accountants. Borrowers shall pay to Lender all customary fees and out-of-pocket expenses incurred by Lender in the exercise of its rights hereunder plus any out of pocket expenses, and all of such fees and expenses shall be netted against the most recent administrative fee paid by Borrowers pursuant to Section 4(d) until such amount is zero and thereafter, such fees and expenses shall constitute Revolving Loans hereunder, payable on demand and, until paid, shall bear interest at the highest rate then applicable to Revolving Loans hereunder. Notwithstanding the foregoing, in absence of an Event of Default, no Borrower shall be obligated to pay fees and expenses for field examinations of such Borrower in excess of two (2) per year and inventory appraisals of such Borrower in excess of one (1) per year;

(e) Each Borrower shall:

(i)    keep the Collateral properly housed and shall keep the Collateral insured for the full insurable value thereof against loss or damage by fire, theft, explosion, sprinklers, collision (in the case of motor vehicles) and such other risks as are customarily insured against by Persons engaged in businesses similar to that of such Borrower with such companies, in such amounts and under policies in such form as shall be satisfactory to Lender. At the request of Lender, complete and correct copies of such policies of insurance shall be delivered to Lender, together with evidence of payment of all premiums therefor, and shall contain an endorsement, in form and substance acceptable to Lender, showing loss under such insurance policies payable to Lender. Such endorsement, or an independent instrument furnished to Lender, shall provide that the insurance company shall give Lender at least thirty (30) days written notice before any such policy of insurance is altered or cancelled and that no act, whether willful or negligent, or default of any Borrower or any other Person shall affect the right of Lender to recover under such policy of insurance in case of loss or damage. In addition, each Borrower shall cause to be executed and delivered to Lender an assignment of proceeds of its business interruption insurance policies. Each Borrower hereby directs all insurers under such policies of insurance to pay all proceeds payable thereunder directly to Lender. Each Borrower irrevocably, makes, constitutes and appoints Lender (and all officers, employees or agents designated by Lender) as such Borrower's true and lawful attorney (and agent-in-fact) for the purpose of making, settling and adjusting claims under such policies of insurance, endorsing the name of such Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance

-29-

and making all determinations and decisions with respect to such policies of insurance; and

(ii)    maintain, at its expense, such public liability and third party property damage insurance as is customary for Persons engaged in businesses similar to that of such Borrower with such companies and in such amounts, with such deductibles and under policies in such form as shall be reasonably satisfactory to Lender and, at the request of Lender, complete and correct copies of such policies shall be delivered to Lender, together with evidence of payment of all premiums therefor; each such policy shall contain an endorsement showing Lender as additional insured thereunder and providing that such insurance company shall give Lender at least thirty (30) days written notice before any such policy shall be altered or cancelled.

If any Borrower at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay any premium in whole or in part relating thereto, then Lender, without waiving or releasing any obligation or default by Borrowers hereunder, may (but shall be under no obligation to) obtain and maintain such policies of insurance and pay such premiums and take such other actions with respect thereto as Lender deems advisable. Such insurance, if obtained by Lender, may, but need not protect any Borrower's interests or pay any claim made by or against such Borrower with respect to the Collateral. Such insurance may be more expensive than the cost of insurance such Borrower may be able to obtain on its own and may be cancelled only upon Borrowers providing evidence satisfactory to Lender that it has obtained the insurance as required above. All sums disbursed by Lender in connection with any such actions, including without limitation court costs, expenses, other charges relating thereto and reasonable attorneys' fees, shall be netted against the most recent administrative fee paid by Borrowers pursuant to Section 4(d) until such amount is zero and thereafter, such costs, expenses and other charges shall constitute Revolving Loans hereunder and shall be payable on demand by Borrowers to Lender and, until paid, shall bear interest at the highest rate then applicable to Revolving Loans hereunder;

(f)    No Borrower shall use its property, or any part thereof, in any unlawful business or for any unlawful purpose or use or maintain any of its property in any manner that does or could result in material damage to the environment or a violation of any applicable environmental laws, rules or regulations; shall keep its property in good condition, repair and order; shall not permit its property, or any part thereof, to be levied upon under execution, attachment, distraint or other legal process; shall grant a security interest in or suffer to exist a lien on any of its property other than Permitted Liens; shall not sell, lease, transfer or otherwise dispose of any of its property except for the sale of Inventory in the ordinary course of its business; and shall secrete or abandon any of its property, or remove or permit removal of any of its property from any of the locations listed on Exhibit B or in any written notice to Lender pursuant to Section 12(b) hereof, except for the removal of Inventory sold in the ordinary course of such Borrower's business;

(g)    all monies and other property obtained by any Borrower from Lender pursuant to this Agreement will be used to refinance certain indebtedness of Borrowers on

the date hereof and for working capital and general corporation purposes of Borrowers thereafter;

(h) Each Borrower shall, at the request of Lender, indicate on its records concerning the Collateral a notation, in form reasonably satisfactory to Lender, of the security interest of Lender hereunder, and no Borrower shall maintain duplicates or copies of such records at any address other than such Borrower's principal place of business set forth on the first page of this Agreement;

(i) Each Borrower and each other Obligor shall file all required tax returns and pay all of its taxes when due, including without limitation taxes imposed by federal, state or municipal agencies, and shall cause any liens for taxes to be promptly released; provided, that such Borrower or other Obligor shall have (A) the right to appropriately file extensions provided that 5 business days in advance of filing any extension other than the initial extension of such Borrower or other Obligor for any given tax year, such Borrower or other Obligor shall disclose to Lender in writing (in form and substance reasonably satisfactory to Lender) the reasons and the basis for requesting such further extension and (B) the right to contest the payment of such taxes in good faith by appropriate proceedings so long as (i) the amount so contested is shown on such Borrower's financial statements and (ii) the contesting of any such payment does not give rise to a lien for taxes. If any Borrower fails to pay any such taxes and in the absence of any such contest by such Borrower, Lender may, upon five (5) business days' notice to such Borrower as long as no Event of Default exists (but shall be under no obligation to) advance and pay any sums required to pay any such taxes and/or to secure the release of any lien therefor, and any sums so advanced by Lender shall constitute Revolving Loans hereunder, shall be payable by Borrowers to Lender, and, until paid, shall bear interest at the highest rate then applicable to Revolving Loans hereunder;

(j) No Borrower shall assume, guarantee or endorse, or otherwise become liable in connection with, the obligations of any Person, except by endorsement of instruments for deposit or collection or similar transactions in the ordinary course of business;

(k) No Borrower shall enter into any merger or consolidation, or enter into any transaction outside the ordinary course of any Borrower's business, including without limitation any purchase, redemption or retirement of any shares of any class of its stock, any acquisition of all or substantially all of the assets of a person and any issuance of any shares of, or warrants or other rights to receive or purchase any shares of, any class of its stock;

(l) No Borrower shall declare or pay any dividend or other distribution (whether in cash or in kind) on any class of its stock or other equity securities; provided that so long as no Event of Default exists or would be caused thereby (i) Stone Warehouse may make distributions to its members for income tax purposes if such distributions are approved in writing in advance by Lender and (ii) so long as no Event of Default exists hereunder, Pyramid Stone may make distributions and dividends not to exceed $2,000 in the aggregate in any calendar month to Verissimo for payments on that certain home equity loan in the

original principal amount of $380,000 on Verissimo's residence located at 14 South Yorkshire Woods, Oakbrook, Illinois;

(m) Each Borrower shall at all times employ both a full-time Chief Financial Officer and a full-time bookkeeper and no Borrower shall pay compensation (whether in the form of salaries, bonuses, consulting fees or otherwise) to any of its officers, directors, members, managers or shareholders in any fiscal year in excess of one hundred ten percent (110%) of the amount paid to such Persons in the immediately preceding fiscal year;

(n) Each Borrower shall (i) keep in full force and effect any and all Plans which may, from time to time, come into existence under ERISA, unless such Plans can be terminated without liability to any Borrower in excess of $40,000; (ii) make contributions to all of the Plans in a timely manner and in a sufficient amount to comply with the requirements of ERISA; (iii) comply with all material requirements of ERISA which relate to Plans (including without limitation the minimum funding standards of Section 302 of ERISA); and (iv) notify Lender immediately upon receipt by such Borrower of any notice of the institution of any proceeding or other action which may result in the termination of any Plans;

(o) No Borrower shall invest in, purchase or otherwise acquire, or contract to invest in, purchase or otherwise acquire, the obligations or stock of any Person, other than direct obligations of the United States;

(p) No Borrower shall amend its organizational documents, change the state of its organization or enter into any transaction which has the effect of changing its state of organization without giving forty five (45) days prior written notice thereof and no Borrower shall change its fiscal year without giving one hundred and twenty (120) days prior written notice thereof;

(q) Each Borrower shall reimburse Lender for all costs and expenses, including without limitation reasonable legal expenses and attorneys' fees, incurred by Lender in connection with documentation, consummation and administration of this Agreement and any other transactions between any Borrower and Lender, including without limitation UCC and other public record searches, lien filings, Federal Express or similar express or messenger delivery, administrative fees, appraisal and field examination costs and fees, surveys, title insurance and environmental audit or review costs, and in seeking to administer, collect, protect or enforce any rights in or to the Collateral or incurred by Lender in seeking to collect any Liabilities and to administer and/or enforce any of Lender's rights under this Agreement and the Other Agreements. All such costs, expenses and charges shall be netted against the most recent administrative fee paid by Borrowers pursuant to Section 4(d) until such amount is zero and thereafter, such costs, expenses and charges shall constitute Revolving Loans hereunder, shall be payable by Borrowers to Lender on demand, and, until paid, shall bear interest at the highest rate then applicable to Revolving Loans hereunder;

(r) No Borrower shall in any material respect, settle or adjust any Account identified by Borrower as an Eligible Account or with respect to which the Account Debtor is an Affiliate without the consent of Lender and shall not settle or adjust any Account following the occurrence and during the continuance of an Event of Default without the consent of Lender; and

(s) Each Borrower shall (a) ensure that no Person who owns a controlling interest in or otherwise controls any Borrower or any Affiliate of Borrower is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in Executive Order No. 13224 or any similar executive order, (b) not use or permit the use of the proceeds of the Loans to violate any of the foreign asset control regulations of OFAC or any enabling statute or executive order relating thereto, and (c) comply, and cause each Subsidiary to comply, with all applicable Bank Secrecy Act laws and regulations, as amended.

14.    **FINANCIAL COVENANTS.**  Borrowers shall maintain and keep in full force and effect each of the financial covenants set forth below:

(a) <u>Leverage</u>.  Pyramid Stone shall not permit the ratio of their aggregate indebtedness for borrowed money (including capitalized leases) as of the date of calculation, to Equity (including subordinated debt) for each period set forth below to exceed the ratio set forth below for the corresponding period set forth below:

| Period | Ratio |
|---|---|
| September 30, 2006 | 2.00:1 |
| December 31, 2006 | 1.75:1 |
| March 31, 2007 | 1.50:1 |
| June 30, 2007 and quarterly thereafter | 1.25:1 |

Stone Warehouse shall not permit the ratio of their aggregate indebtedness for borrowed money (including capitalized leases) as of the date of calculation, to EBITDA for each period set forth below to exceed the ratio set forth below for the corresponding period set forth below:

| Period | Ratio |
|---|---|
| September 30, 2006 | 5.9x |
| December 31, 2006 | 5.5x |
| March 31, 2007 | 4.9x |
| June 30, 2007 | 4.5x |
| September 30, 2007 and quarterly thereafter | 3.9x |

(b) <u>Dilution</u>.  At all times at the intervals indicated below, the Borrowers shall maintain its Account Dilution at a level set forth below for the corresponding period, on the applicable trailing twelve month basis.

| Borrower | Date | Percent |
|---|---|---|
| Pyramid Stone | December 31, 2006 | 8% or less |
| | March 31, 2007 and quarterly thereafter | 5% or less |
| Stone Warehouse | December 31, 2006 | 5% or less |
| | March 31, 2007 and quarterly thereafter | 3% or less |

(c) **Capital Expenditure Limitations**.   No Borrower shall individually make any Capital Expenditures if, after giving effect to such Capital Expenditure, the aggregate cost of all Capital Expenditures made by such Borrower would exceed $75,000 during any Fiscal Year.

(d) **Account Turn-Over**.  At all times at the intervals indicated below, the Borrowers shall maintain its Account turn-over at a level set forth below for the corresponding period, on the applicable trailing twelve month basis.

| Borrower | Date | Days |
|---|---|---|
| Pyramid Stone | December 31, 2006 | 60 days or less |
| | March 31, 2007 and quarterly thereafter | 55 days or less |
| Stone Warehouse | December 31, 2006 | 50 days or less |
| | March 31, 2007 and quarterly thereafter | 45 days or less |

(e) **Inventory Turn-Over**.  At all times at the intervals indicated below, Stone Warehouse shall maintain its turnover of inventory at a level set forth below for the corresponding period, on the applicable trailing twelve month basis.

| Date | X |
|---|---|
| December 31, 2006 | 2.0x |
| March 31, 2007 | 2.5x |
| June 30, 2007 and quarterly thereafter | 3.0x |

15.    **DEFAULT**.  The occurrence of any one or more of the following events shall constitute an "**Event of Default**" by Borrowers hereunder:

(a) the failure of any Obligor to pay when due any of the Liabilities;

(b) the failure of any Obligor to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Obligor under this Agreement or any of the Other Agreements;

(c) (i) the failure of any Obligor to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Obligor under any agreement with any Person for borrowed money or (ii) the failure of any Obligor to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Obligor under any other agreement with any Person if such failure may have a material

-34-

adverse effect on such Obligor's business property, assets, operations or condition, financial or otherwise;

(d) the making or furnishing by any Obligor to Lender of any representation, warranty, certificate, schedule, report or other written communication within or in connection with this Agreement or the Other Agreements, which is untrue or misleading in any respect;

(e) the loss, theft, damage, or destruction of any of the Collateral having a value in excess of $50,000, or (except as permitted hereby) sale, lease or furnishing under a contract or service of any of the Collateral;

(f) the making or any attempt to make any levy, seizure or attachment of any of any Borrower's property;

(g) (the commencement of any proceedings in bankruptcy by or against any Obligor or for the liquidation or reorganization of any Obligor, or alleging that such Obligor is insolvent or unable to pay its debts as they mature, or for the readjustment or arrangement of any Obligor's debts, whether under the United States Bankruptcy Code or under any other law, whether state or federal, now or hereafter existing for the relief of debtors, or the commencement of any analogous statutory or non-statutory proceedings involving any Obligor; provided, however, that if such commencement of proceedings against such Obligor is involuntary and such Obligor is contesting such proceedings in good faith, such action shall not constitute an Event of Default unless such proceedings are not dismissed within sixty (60) days after the commencement of such proceedings;

(h) the appointment of a receiver or trustee for any Obligor, for any of the Collateral or for any substantial part of any Obligor's assets or the institution of any proceedings for the dissolution, or the full or partial liquidation, of any Obligor which is a corporation, partnership or limited liability company; provided, however, that if such appointment or commencement of proceedings against such Obligor is involuntary and such Obligor is contesting such proceedings in good faith, such action shall not constitute an Event of Default unless such appointment is not revoked or such proceedings are not dismissed within sixty (60) days after the commencement of such proceedings;

(i) the entry of any judgment or order in excess of $50,000 against any Obligor which remains unsatisfied or undischarged and in effect for thirty (30) days after such entry without a stay of enforcement or execution;

(j) the death of any Obligor who is a natural Person or the dissolution of any Obligor which is a partnership, corporation or limited liability company;

(k) the occurrence of a change of control, direct or indirect, of any Borrower;

(l) the occurrence of an event of default under, or the revocation or termination of, any agreement, instrument or document executed and delivered by any Person to Lender pursuant to which such Person has guaranteed to Lender the payment of

all or any of the Liabilities or has granted Lender a security interest in or lien upon some or all of such Person's real and/or personal property to secure the payment of all or any of the Liabilities;

(m) the institution in any court of a criminal proceeding against any Obligor, or the indictment of any Obligor for any crime; or

(n) the occurrence of any material adverse change in the Collateral, business, property, assets, operations or financial condition of any Obligor, as determined by Lender in its sole judgment or the occurrence of any event which would reasonably be expected to have a material adverse effect on the Collateral, business, property, assets, prospects, operations or condition, financial or otherwise, of any Obligor.

16.    **REMEDIES UPON AN EVENT OF DEFAULT.**

(a) Upon the occurrence of an Event of Default described in Section 15(g) hereof, all of Borrowers' Liabilities shall immediately and automatically become due and payable, without notice of any kind and upon the occurrence of any other Event of Default, all Liabilities may, at the option of Lender, and without demand, notice or legal process of any kind, be declared, and immediately shall become, due and payable.

(b) Upon the occurrence of an Event of Default, Lender may exercise from time to time any rights and remedies available to it under the UCC and any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Agreement or in any of the Other Agreements and all of Lender's rights and remedies shall be cumulative and non-exclusive to the extent permitted by law. In particular, but not by way of limitation of the foregoing, Lender may, without notice, demand or legal process of any kind, take possession of any or all of the Collateral (in addition to Collateral of which it already has possession), wherever it may be found, and for that purpose may pursue the same wherever it may be found, and may enter into any of any Borrower's premises where any of the Collateral may be, and search for, take possession of, remove, keep and store any of the Collateral until the same shall be sold or otherwise disposed of, and Lender shall have the right to store the same at any of any Borrower's premises without cost to Lender. At Lender's request, each Borrower shall, at Borrowers' expense, assemble the Collateral and make it available to Lender at one or more places to be designated by Lender and reasonably convenient to Lender and Borrowers. Each Borrower recognizes that if such Borrower fails to perform, observe or discharge any of its Liabilities under this Agreement or the Other Agreements, no remedy at law will provide adequate relief to Lender, and agrees that Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages. Any notification of intended disposition of any of the Collateral required by law will be deemed to be a reasonable authenticated notification of disposition if given at least ten (10) days prior to such disposition and such notice shall (i) describe Lender and the applicable Borrower, (ii) describe the Collateral that is the subject of the intended disposition, (iii) state the method of the intended disposition, (iv) state that such Borrower is entitled to an accounting of the Liabilities and state the charge, if any, for an accounting and (v) state the time and place of any public disposition or the time after

which any private sale is to be made. Lender may disclaim any warranties that might arise in connection with the sale, lease or other disposition of the Collateral and has no obligation to provide any warranties at such time . Any proceeds of any disposition by Lender of any of the Collateral may be applied by Lender to the payment of expenses in connection with the Collateral, including without limitation legal expenses and reasonable attorneys' fees, and any balance of such proceeds may be applied by Lender toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect.

17.    **INDEMNIFICATION.** Each Borrower agrees to defend (with counsel satisfactory to Lender), protect, indemnify and hold harmless Lender, each Affiliate of Lender, and each of their respective officers, directors, employees, attorneys and agents (each an **"Indemnified Party"**) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature (including without limitation the disbursements and the reasonable fees of counsel for each Indemnified Party in connection with any investigative, administrative or judicial proceeding, whether or not the Indemnified Party shall be designated a party thereto), which may be imposed on, incurred by, or asserted against, any Indemnified Party (whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including without limitation securities, environmental and commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of this Agreement or any Other Agreement, or any act, event or transaction related or attendant thereto, the making and the management of the Loans or the use or intended use of the proceeds of the Loans; provided, however, that no Borrower shall have any obligation hereunder to any Indemnified Party with respect to matters caused by or resulting from the willful misconduct or gross negligence of such Indemnified Party. To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, each Borrower shall satisfy such undertaking to the maximum extent permitted by applicable law. Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Indemnified Party upon five (5) business days' prior written notice, and, failing prompt payment, shall, together with interest thereon at the highest rate then applicable to Revolving Loans hereunder from the date incurred by each Indemnified Party until paid by Borrowers, be added to the Liabilities of Borrowers and be secured by the Collateral. The provisions of this Section 17 shall survive the satisfaction and payment of the other Liabilities and the termination of this Agreement.

18.    **NOTICE.** All written notices and other written communications with respect to this Agreement shall be sent by ordinary, certified or overnight mail, by telecopy or delivered in person, and in the case of Lender shall be sent to it at 24 Grassy Plain Street, Bethel, Connecticut 06801, Attention: Dan Dobrjanskyj with a copy to 10 North Martingale Road, Suite 400, Schaumburg, Illinois 60173, Attention: Louis T. Marosi, and in the case of any Borrower shall be sent to it at its principal place of business set forth on the first page of this Agreement with a copy to Much Shelist, 191 North Wacker Drive, Suite 1800, Chicago, Illinois, 60606, Attention: Mitchell S. Roth.

19.    **CHOICE OF GOVERNING LAW; CONSTRUCTION; FORUM SELECTION.** This Agreement and the Other Agreements are submitted by Borrowers to

Lender for Lender's acceptance or rejection at Lender's principal place of business as an offer by Borrowers to borrow monies from Lender now and from time to time hereafter, and shall not be binding upon Lender or become effective until accepted by Lender, in writing, at said place of business. If so accepted by Lender, this Agreement and the Other Agreements shall be deemed to have been made at said place of business. **THIS AGREEMENT AND THE OTHER AGREEMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS, INCLUDING WITHOUT LIMITATION THE LEGALITY OF THE INTEREST RATE AND OTHER CHARGES, BUT EXCLUDING PERFECTION OF THE SECURITY INTERESTS IN THE COLLATERAL, WHICH SHALL BE GOVERNED AND CONTROLLED BY THE LAWS OF THE RELEVANT JURISDICTION.** If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or remaining provisions of this Agreement.

To induce Lender to accept this Agreement, each Borrower irrevocably agrees that, subject to Lender's sole and absolute election, **ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER AGREEMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE CITY OF CHICAGO, STATE OF ILLINOIS. BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. EACH BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH BORROWER BY LENDER IN ACCORDANCE WITH THIS SECTION 19.**

20. **PARTICIPATION; ASSIGNMENT.** Lender shall have the right to assign all or any of its rights under this Agreement and the Other Agreements, and/or to offer participation interests therein, to any Person, without the consent of Borrower. In such event, each Borrower shall execute such agreements, instruments and documents as Lender shall reasonably request in connection therewith, including without limitation agreements, instruments and documents in favor of each assignee and participant.

21. **MODIFICATION AND BENEFIT OF AGREEMENT.** This Agreement and the Other Agreements may not be modified, altered or amended except by an agreement in writing signed by each Borrower and Lender. No Borrower may sell, assign or transfer this Agreement, or the Other Agreements or any portion thereof, including without limitation any Borrower's rights, titles, interest, remedies, powers or duties thereunder.

22. **HEADINGS OF SUBDIVISIONS.** The headings of subdivisions in this Agreement are for convenience of reference only, and shall not govern the interpretation of any of the provisions of this Agreement.

-38-

23.     **POWER OF ATTORNEY.** Each Borrower acknowledges and agrees that its appointment of Lender as its attorney and agent-in-fact for the purposes specified in this Agreement is an appointment coupled with an interest and shall be irrevocable until all of the Liabilities are paid in full and this Agreement is terminated.

24.     **WAIVER OF JURY TRIAL; OTHER WAIVERS.**

(a) **EACH BORROWER HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS AGREEMENT, ANY OF THE OTHER AGREEMENTS, THE LIABILITIES, THE COLLATERAL, ANY ALLEGED TORTIOUS CONDUCT BY ANY BORROWER OR LENDER OR WHICH, IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISES OUT OF OR RELATES TO THE RELATIONSHIP BETWEEN BORROWERS AND LENDER.   IN NO EVENT SHALL LENDER BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.**

(b) Each Borrower hereby waives demand, presentment, protest and notice of nonpayment, and further waives the benefit of all valuation, appraisal and exemption laws.

(c) **EACH BORROWER HEREBY WAIVES ALL RIGHTS TO NOTICE AND HEARING OF ANY KIND PRIOR TO THE EXERCISE BY LENDER OF ITS RIGHTS TO REPOSSESS THE COLLATERAL OF SUCH BORROWER WITHOUT JUDICIAL PROCESS OR TO REPLEVY, ATTACH OR LEVY UPON SUCH COLLATERAL WITHOUT PRIOR NOTICE OR HEARING.**

(d) Lender's failure, at any time or times hereafter, to require strict performance by such Borrower of any provision of this Agreement or any of the Other Agreements shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith.  Any suspension or waiver by Lender of an Event of Default under this Agreement or any default under any of the Other Agreements shall not suspend, waive or affect any other Event of Default under this Agreement or any other default under any of the Other Agreements, whether the same is prior or subsequent thereto and whether of the same or of a different kind or character.  No delay on the part of Lender in the exercise of any right or remedy under this Agreement or any Other Agreement shall preclude other or further exercise thereof or the exercise of any right or remedy.  None of the undertakings, agreements, warranties, covenants and representations of any Borrower contained in this Agreement or any of the Other Agreements and no Event of Default under this Agreement or default under any of the Other Agreements shall be deemed to have been suspended or waived by Lender unless such suspension or waiver is in writing, signed by a duly authorized officer of Lender and directed to each Borrower specifying such suspension or waiver.

25.     **JOINT AND SEVERAL LIABILITY.**

(a) Notwithstanding anything to the contrary contained herein, all Liabilities of each Borrower hereunder shall be joint and several obligations of Borrowers.

(b) Notwithstanding any provisions of this Agreement to the contrary, it is intended that the joint and several nature of the Liabilities of Borrowers and the liens and security interests granted by Borrowers to secure the Liabilities, not constitute a "Fraudulent Conveyance" (as defined below). Consequently, Lender and Borrowers agree that if the Liabilities of a Borrower, or any liens or security interests granted by such Borrower securing the Liabilities would, but for the application of this sentence, constitute a Fraudulent Conveyance, the Liabilities of such Borrower and the liens and security interests securing such Liabilities shall be valid and enforceable only to the maximum extent that would not cause such Liabilities or such lien or security interest to constitute a Fraudulent Conveyance, and the Liabilities of such Borrower and this Agreement shall automatically be deemed to have been amended accordingly. For purposes hereof, "Fraudulent Conveyance" means a fraudulent conveyance under Section 548 of Chapter 11 of Title II of the United States Code (11 U.S.C. § 101, et seq.), as amended (the "Bankruptcy Code") or a fraudulent conveyance or fraudulent transfer under the applicable provisions of any fraudulent conveyance or fraudulent transfer law or similar law of any state, nation or other governmental unit, as in effect from time to time.

(c) Each Borrower assumes responsibility for keeping itself informed of the financial condition of each other Borrower, and any and all endorsers and/or guarantors of any instrument or document evidencing all or any part of such other Borrower's Liabilities and of all other circumstances bearing upon the risk of nonpayment by such other Borrowers of their Liabilities and each Borrower agrees that Lender shall have no duty to advise such Borrower of information known to Lender regarding such condition or any such circumstances or to undertake any investigation not a part of its regular business routine. If Lender, in its sole discretion, undertakes at any time or from time to time to provide any such information to a Borrower, Lender shall not be under any obligation to update any such information or to provide any such information to such Borrower on any subsequent occasion.

(d) Lender is hereby authorized, without notice or demand and without affecting the liability of a Borrower hereunder, to, at any time and from time to time, (i) renew, extend, accelerate or otherwise change the time for payment of, or other terms relating to a Borrower's Liabilities on such terms agreed to by such Borrower or otherwise modify, amend or change the terms of any promissory note or other agreement, document or instrument now or hereafter executed by a Borrower and delivered to Lender; (ii) accept partial payments on a Borrower's Liabilities; (iii) take and hold security or Collateral for the payment of a Borrower's Liabilities hereunder or for the payment of any guaranties of a Borrower's Liabilities or other liabilities of a Borrower and exchange, enforce, waive and release any such security or Collateral; (iv) apply such security or Collateral and direct the order or manner of sale thereof as Lender, in its sole discretion, may determine; and (v) settle, release, compromise, collect or otherwise liquidate a Borrower's Liabilities and any security or Collateral therefor in any manner, without affecting or impairing the obligations of the other Borrowers. Lender shall have the

-40-

exclusive right to determine the time and manner of application of any payments or credits, whether received from a Borrower or any other source, and such determination shall be binding on such Borrower. All such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of a Borrower's Liabilities as Lender shall determine in its sole discretion without affecting the validity or enforceability of the Liabilities of the other Borrowers.

(e) Each Borrower hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (i) the absence of any attempt to collect a Borrower's Liabilities from any Borrower or any guarantor or other action to enforce the same; (ii) the waiver or consent by Lender with respect to any provision of any instrument evidencing Borrowers' Liabilities, or any part thereof, or any other agreement heretofore, now or hereafter executed by a Borrower and delivered to Lender except to the extent of such waiver or consent; (iii) failure by Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or Collateral for Borrowers' Liabilities; (iv) the institution of any proceeding under the Bankruptcy Code, or any similar proceeding, by or against a Borrower or Lender's election in any such proceeding of the application of Section 1111(b)(2) of the Bankruptcy Code; (v) any borrowing or grant of a security interest by any Borrower as debtor-in-possession, under Section 364 of the Bankruptcy Code; (vi) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of Lender's claim(s) for repayment of any of Borrowers' Liabilities; or (vii) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (other than payment in full of the Liabilities).

(f) Until the payment in full of the Liabilities, no payment made by or for the account of a Borrower including, without limitation, (i) a payment made by such Borrower on behalf of another Borrower's Liabilities or (ii) a payment made by any other person under any guaranty, shall entitle such Borrower, by subrogation or otherwise, to any payment from such other Borrower or from or out of such other Borrower's property and such Borrower shall not exercise any right or remedy against such other Borrower or any property of such other Borrower by reason of any performance of such Borrower of its joint and several obligations hereunder.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above referenced.

RZB FINANCE LLC, as Lender

By: _____
Its: _____
    ERIC SALAT
    GROUP VICE PRESIDENT

By: _____
Its: _____
    HERMINE KIROLOS
    Group Vice President


PYRAMID STONE MFG., INC., as a Borrower


By: _____
Its: _____


STONE WAREHOUSE, LLC, as a Borrower


By: _____
Its: _____


_____
Rodrigo Biscaya


_____
Carlo Verissimo


_____
Tomas Orozco

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above referenced.

RZB FINANCE LLC, as Lender

By: _____
Its: _____

By: _____
Its: _____

PYRAMID STONE MFG., INC., as a Borrower

By: _____
Its: _____

STONE WAREHOUSE, LLC, as a Borrower

By: _____
Its: _____

_____
Rodrigo Biscaya

_____
Carlo Verissimo

_____
Tomas Orozco

## LIST OF EXHIBITS

| | | |
|---|---|---|
| A | - | Form of Note |
| B | - | Business and Collateral Locations |
| C | - | Permitted Liens |
| D | - | Additional Names |
| E | - | Equipment List |
| F | - | Indebtedness |
| G | - | Shareholders; Subsidiaries |
| H | - | Commercial Tort Claims |
| I | - | Closing Checklist |
| J | - | Form of Notice of Borrowing |
| K | - | Litigation |

**EXHIBIT A**

<u>Form of Note</u>

See attached.

# REVOLVING NOTE

New York, New York
June ___, 2006

**$5,000,000.00**

FOR VALUE RECEIVED, each of PYRAMID STONE MFG., INC., an Illinois corporation and STONE WAREHOUSE, LLC, an Illinois limited liability company (collectively, the "**Borrowers**"), hereby promise to pay to the order of RZB FINANCE LLC, its successors and assigns (the "**Lender**"), at its office at 24 Grassy Plain Street, Bethel, Connecticut 06801, or pursuant to such other instructions or at such other address as it shall designate, the principal sum of Five Million and 00/100 Dollars ($5,000,000.00) or, if less, the unpaid principal amount of all Revolving Loans at the time and in the amounts provided in the Loan Agreement (as hereinafter defined), in lawful money of the United States and in immediately available funds, and to pay interest on the outstanding principal amount of such Loans, in like money, until paid, at the times, at the rates per annum and in the manner specified in the Loan Agreement. The holder of this Note is authorized to record on this Note the amount and the date of each borrowing, each payment of principal with respect thereto pursuant to the Loan Agreement, and such other information as it may deem necessary, which notations shall constitute prima facie evidence of the accuracy of the information recorded. Failure of the holder of this Note to make any such notation or any error therein shall not limit or otherwise affect the obligations of the Borrowers hereunder and (absent manifest error) the records of the holder of this Note shall at all times be determinative of the unpaid balance of this Note (whether or not the holder of this Note has made such notations on this Note).

This Note is the Revolving Note referred to in that certain Loan and Security Agreement dated as of the date hereof by and among the Borrowers and Lender (as from time to time amended, modified, restated or supplemented, the "**Loan Agreement**"), and is expressly subject to the terms and provisions of the Loan Agreement. All capitalized terms used in this Note without definition shall have the meanings ascribed to them in the Loan Agreement.

The principal amount of this Note may be prepaid, reborrowed and repaid by the Borrowers in accordance with the terms of the Loan Agreement. The principal amount of this Note is subject to mandatory repayment in accordance with the Loan Agreement.

In accordance with the Loan Agreement, the outstanding principal amount hereof and all accrued interest thereon shall be due and payable on the Termination Date without presentment, demand, protest or notice of any kind, all of which, to the extent permitted by applicable law, are hereby unconditionally and irrevocably waived by the Borrowers.

Failure or delay of the Lender to enforce any provision of this Note shall not be deemed a waiver of any such provision, and the Lender shall not be prevented from enforcing any such provision at a later time. Any waiver of any provision hereof must be in

writing and signed by an authorized officer of the Lender. Any such waiver, and any consent or approval shall be effective only in the specific instance and for the specific purpose for which it is given.

The obligations of the Borrowers to the Lender hereunder and under the Loan Agreement are secured by the liens granted to Lender by the Borrowers pursuant to the Loan Agreement, and the holder of this Note is entitled to the benefits of the Loan Agreement.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO NEW YORK CHOICE OF LAW PRINCIPLES.

BORROWER:

PYRAMID STONE MFG., INC.

By _____

Its _____

STONE WAREHOUSE, LLC

By _____

Its _____

Revolving Note

## EXHIBIT B

### Business and Collateral Locations

A.　Stone Warehouse's Business Locations (please indicate which location is the principal place of business and at which locations originals and all copies of Stone Warehouse's books, records and accounts are kept).

    1.　301 – 303 S. Eisenhower Lane, Lombard, Illinois 60148 (principal place of business and location of books, records and accounts)

    2.　70 S. Eisenhower Lane, Lombard, Illinois 60148

B.　Other locations of Collateral (including without limitation warehouse locations, processing locations, consignment locations) and all post office boxes of Stone Warehouse. Please indicate the relationship of such location to Stone Warehouse (i.e. public warehouse, processor, etc.).

    None.

C.　Pyramid Stone's Business Locations (please indicate which location is the principal place of business and at which locations originals and all copies of Pyramid Stone's books, records and accounts are kept).

    1.　11 S. Eisenhower Lane, Lombard, Illinois 60148 (principal place of business and location of books, records and accounts)

D.　Other locations of Collateral (including without limitation warehouse locations, processing locations, consignment locations) and all post office boxes of Pyramid Stone. Please indicate the relationship of such location to Pyramid Stone (i.e. public warehouse, processor, etc.).

    None.

# EXHIBIT C

## Permitted Liens

| | Borrower | Filing No. | Filing Date | Secured Party | Collateral |
|---|---|---|---|---|---|
| 1. | Stone Warehouse, LLC | 009735887 | 04/15/05 | First Personal Bank | water filtration equipment |
| 2. | Stone Warehouse, LLC | 010135745 | 08/29/05 | First Premier Capital, LLC | leased equipment |
| 3. | Pyramid Stone Mfg., Inc. | 003836936 | 04/20/98 Continued: 11/18/02 | Stearns Bank NA | leased equipment |
| 4. | Pyramid Stone Mfg., Inc. | 004463842 | 1/19/01 | Toyota Financial Services | Vehicle |
| 5. | Pyramid Stone Mfg., Inc. | 004473022 | 12/10/01 | Toyota Financial Services | Vehicle |
| 6. | Pyramid Stone Mfg., Inc. | 005199859 | 05/06/02 | Toyota Financial Services | Vehicle |
| 7. | Pyramid Stone Mfg., Inc. | 005356377 | 06/04/02 | Toyota Financial Services | Vehicle |
| 8. | Pyramid Stone Mfg., Inc. | 007560036 | 09/16/03 | Wells Fargo Bank Minnesota, N.A. | Certain Equipment pursuant to lease agreement |
| 9. | Pyramid Stone Mfg., Inc. | 007629117 | 10/01/03 | First Federal Leasing | Polishing machine |
| 10. | Pyramid Stone Mfg., Inc. | 008626014 | 05/03/04 | First Personal Bank | Bridge Saw Machine |
| 11. | Pyramid Stone Mfg., Inc. | 004113627 | 10/26/99 Continued: 5/25/04 | Stearns Bank NA | Leases |
| 12. | Pyramid Stone Mfg., Inc. | 009735887 | 04/15/05 | First Personal Bank | water filtration equipment |
| 13. | Pyramid Stone Mfg., Inc. | 010065038 | 08/03/05 | First Federal Leasing | polishing machine |
| 14. | Pyramid Stone Mfg., Inc. | 010519527 | 01/03/06 | Great American Finance LLC | Vehicle |

**EXHIBIT D**

<u>Additional Names</u>

None.

# EXHIBIT E

## Equipment List

Also see attached.

| | Borrower | Model | VIN | Owned/Leased |
|---|---|---|---|---|
| 1. | Pyramid Stone Mfg., Inc. | Toyota 7FGCU25 Serial Number 71904 forklift | N/A | Leased from Toyota Financial Services |
| 2. | Pyramid Stone Mfg., Inc. | Toyota 6FGCU45 Serial Number 60387 forklift | N/A | Leased from Toyota Financial Services |
| 3. | Pyramid Stone Mfg., Inc. | Toyota 7FGCU70 Serial Number 60244 forklift | N/A | Leased from Toyota Financial Services |
| 4. | Pyramid Stone Mfg., Inc. | Toyota 6FGCU25 Serial Number 72843 forklift | N/A | Leased from Toyota Financial Services |
| 5. | Pyramid Stone Mfg., Inc. | 1999 Chevrolet C3 500-HD 2002 Doolittle Trailer | 1GBKC34J3XF2 068003 | Leased from Great American Finance LLC |
| 6. | Pyramid Stone Mfg., Inc. | 1995 Dodge RAM 1500 | 3B7HC13Z0SM1 67887 | Owned |
| 7. | Stone Warehouse LLC | 2003 Truck – Chevy - Kodiak | IGBJ7J1E33F506 73 | Leased |
| 8. | Stone Warehouse LLC | 1999 Truck – GMC Chevy – C Series | 1GBKC34F4X40 126015 | Leased |
| 9. | Stone Warehouse LLC | 2002 Trailer – Doolittle | IDGRS18262MO 47662 | Leased |



Pyramid Stone Manufacturing, Inc.
Operating Lease Worksheet
December 31, 2005

Need Contract

| Vendor | Equipment | Monthly $ | Thru |
|---|---|---|---|
| Toyota | Forklift |  | 11/30 |
| 1st Bank & trust | Porsche | 942.64 | 11/02 |
| Paradata | Credit Card Machine | 67.57 | Monthly |
| Great American | Sony Vlao | 138.18 | 05/15/07 |
| GE Capital | Printer | 161.98 | 06/06/08 |
| Chase | Mercedes | 1,135.90 | 04/15 |
| GMAC | 02 Trail Blazer | 586.00 | 02/07 |
| Leasing Services | Copier | 113.87 |  |
| Marlin Leasing | Xerox Printer | 12.44 |  |
| Varesources | Xerox Printer/Copier | 88.41 | 05/31/08 |
| Apple Financial | Laptop | 122.58 | 08/20/07 |
|  |  | 3,565.94 |  |

CARLO

| Vendor | Equipment | Monthly $ | Thru |
|---|---|---|---|
| 11 S Eisenhower | Building |  |  |

| Year | Amount |
|---|---|
| 2005 |  |
| 2006 |  |
| 2007 |  |
| 2008 |  |
| 2009 |  |
| Thereafter |  |

| 2004 lease expense |  |
|---|---|
| Buildings | 101,596.20 |
| Vehicle | 35,432.18 |
| Equipment | 14,196.58 |
| Total | 151,224.96 |

9 Vehicles
+ 1 owned
10 Vehicles

X-

**Lease Schedule**

Pyramid Stone Manufacturing, Inc.
Capital Lease Worksheet
December 31, 2005

Need Contract

| Vendor | Equipment | Monthly $ | Thru |
|---|---|---|---|
| Financial Pacific L | Bridge Saw | ▓▓▓▓▓ | 09/15/▓▓ |
| One Source Capital | Edge Polishing Machine | ▓▓▓▓▓ | 09/11/▓▓ |
| GAFCO | Bridge Saw | ▓▓▓▓▓ | 06/01/▓▓ |
| One Source Cap | Electric Polisher | ▓▓▓▓▓ | 07/31/▓▓ |
| GAFCO | Fabrication Mach. ? | 832.16 | ✗ |
| GMAC | ▓▓▓▓▓ | ▓▓▓▓▓ | 06/25/▓▓ |
| GMAC | ▓▓▓▓▓ | ▓▓▓▓▓ | 03/20/▓▓ |
| GMAC | ▓▓▓▓▓ | ▓▓▓▓▓ | 10/26/▓▓ |
| GMAC | ▓▓▓▓▓ | ▓▓▓▓▓ | 12/03/▓▓ |
| GMAC | ▓▓▓▓▓ | ▓▓▓▓▓ | 10/20/▓▓ |
| 1st Bank & Trust | ▓▓▓▓▓ | ▓▓▓▓▓ | 11/14/▓▓ |
| GE Capital | Nortel Phones | 253.31 | 07/31/05 |
| | | 9,205.40 | |

| Year | Amount |
|---|---|
| 2005 | 109,198.25 |
| 2006 | 83,756.24 |
| 2007 | 72,281.64 |
| 2008 | 48,731.24 |
| 2009 | 9,682.92 |
| Thereafter | 0.00 |
| Total payments | 323,650.29 |

| | |
|---|---|
| GAFCO | 26,404.88 |
| Financial Pacific | 22,037.97 |
| GE Capital | 116.95 |
| Source One | 9,822.99 |
| GMAC 02 Silverado | 1,509.45 |
| GMAC 02 Savana | 2,397.83 |
| GMAC 02 Sierra | 581.09 |

Lease Schedule

| | |
|---|---|
| GMAC 01 Cargo van | 1,894.85 |
| GMAC 02 Sierra | 566.04 |
| 1st Bank 03 Silverado | 3,935.28 |
| **Total Interest** | 89,267.33 |

Lease Schedule

X.

# EXHIBIT F

## Indebtedness

See attached.

**Recap of Shareholders Loans**

|  | Per Pyramid's Books | Per Stone's Books | Totals |
|---|---|---|---|
| Carlo | -584,444.87 | -32,130.55 | -616,575.42 |
| Rodrigo | -172,998.58 | -190,900.25 | -363,898.83 |
| Tomas | -40,000.00 | -3,921.88 | -43,921.88 |
| 11 South | -42,117.19 | -177,638.33 | -219,755.52 |
| Totals | -839,560.64 | -404,591.01 | -1,244,151.65 |

Note:  Negative (-) is indicating $'s due

11 South, owes Pyramid Stone (as of May 31, 2006) a total of  $212,886.30 for
amounts disbursed for mainly Leasehold Improvements

## EXHIBIT G

### Shareholders; Subsidiaries

<u>Equityholders of Pyramid Stone</u>:
Rodrigo Biscaya – 50%
Carlo Verissimo – 50%


<u>Equityholders of Stone Warehouse</u>:
Rodrigo Biscaya – 47.5%
Carlo Verissimo – 47.5%
Tomas Orozco – 5%

## EXHIBIT H

Commercial Tort Claims

None.

**EXHIBIT I**

<u>Closing Checklist</u>

See attached.

## CLOSING CHECKLIST

## LOANS BY RZB FINANCE LLC
## TO
## PYRAMID STONE MFG., INC.
## AND
## STONE WAREHOUSE, LLC

I.  <u>Parties</u>

    A.  RZB Finance LLC ("Lender")
        24 Grassy Plains
        Bethel, Connecticut  06801

    B.  Pyramid Stone Mfg., Inc. ("Pyramid Stone")
        11 S. Eisenhower
        Lombard, Illinois  60148

    C.  Stone Warehouse, LLC ("Stone Warehouse" and collectively with "Pyramid
        Stone", "Borrowers")
        11 S. Eisenhower
        Lombard, Illinois  60148

    D.  11 S. Eisenhower, LLC ("Eisenhower")
        11 S. Eisenhower
        Lombard, Illinois  60148

    E.  Rodrigo Biscaya ("Biscaya")
        14 S. Yorkshire Woods
        Oakbrook, Illinois  60523

    F.  Tomas Orozco ("Orozco")
        6518 McArthur Drive
        Woodbridge, Illinois 60517

    G.  Carlo Verissimo ("Verissimo" and collectively with Biscaya and Orozco,
        "Owners")
        14 S. Yorkshire Woods
        Oakbrook, Illinois  60523

II.    Counsel to Parties

    A.    Lender:

        Goldberg, Kohn, Bell, Black,
          Rosenbloom & Moritz, Ltd. ("GK")
        55 East Monroe Street
        Suite 3700
        Chicago, Illinois  60603
        Telephone:    (312) 201-4000
        Telecopy:    (312) 332-2196
        Attention:    Richard M. Kohn and William A. Starshak

    B.    Borrowers and Owners:

        Much Shelist
        191 North Wacker Drive
        Suite 1800
        Chicago, Illinois  60606
        Telephone:    (312) 521-2477
        Telecopy:    (312) 521-2377
        Attention:    Mitchell Roth

III.    Closing Documents

    A.    Items delivered by, or pertaining to, Borrowers:

        1.    Loan and Security Agreement

        2.    $5,000,000 Revolving Note

        3.    Items with respect to Borrowers' property, liability and credit insurance, as follows:

            a.    Certificates of insurance with respect to property, boiler and machinery, marine, fire and business interruption policies, each showing Lender as lender's loss payee, with lender's loss payable clause in favor of Lender

            b.    Certificates of insurance with respect to liability policies, each showing Lender as additional insured

            c.    Assignment of Proceeds from Business Interruption Insurance Policy as Collateral Security

            d.    Letter re no additional loss payees

4.    Authorization to Disburse Proceeds

5.    Lockbox and Blocked Account Agreement covering Pyramid Stone and Stone Warehouse

6.    Landlord's Agreement for the following locations:

    a.    70, 301, 303 S. Eisenhower, Lombard, Illinois

    b.    11 S. Eisenhower, Lombard, Illinois

7.    UCC financing statement showing Pyramid Stone as debtor, filed with the Secretary of State of Illinois

8.    UCC financing statement showing Stone Warehouse as debtor, filed with the Secretary of State of Illinois

9.    Authorization to pre-file UCC financing statements

10.    Secretary's Certificate of Pyramid Stone as to:

    a.    Articles of Incorporation

    b.    Bylaws

    c.    Incumbency of Officers

    d.    List of Directors and Shareholders

    e.    Resolutions

11.    Certificates of good standing for Pyramid Stone in the state of Illinois and each other state where Pyramid Stone is qualified to do business

12.    Manager's Certificate of Stone Warehouse as to:

    a.    Articles of Organization

    b.    Operating Agreement

    c.    Incumbency of officers

    d.    Resolutions

13.    Certificates of good standing for Stone Warehouse in the state of Illinois and each other state where Stone Warehouse is qualified to do business

14.     Initial Borrowing Base Certificate

15.     Pyramid Stone Intercompany Note, and Allonge

16.     Intercompany Subordination Agreement

B.     <u>Items by or pertaining to Eisenhower and Owners</u>:

1.     Continuing Unconditional Guaranty

2.     Subordination Agreement

3.     Pledge Agreement, including stock certificates and assignments separate from certificate

4.     UCC financing statement showing Biscaya as debtor, filed with the Secretary of State of Illinois

5.     UCC financing statement showing Orozco as debtor, filed with the Secretary of State of Illinois

6.     UCC financing statement showing Verissimo as debtor, filed with the Secretary of State of Illinois

7.     Eisenhower Second Mortgage

      a.     Certified Copy of Eisenhower First Mortgage

      b.     Title commitment

      c.     Subordination of Lease

8.     Verissimo Third Mortgage

      a.     Appraisal of residence at 14 S. Yorkshire Woods, Oakbrook, Illinois 60523

      b.     Title commitment

C.     <u>Other items</u>:

1.     Pay-off Letter Royal American Bank

      a.     UCC Termination

2.     Other pay-off letters/terminations

      a.     Eisenhower

-4-

3.    Pre-closing search report (UCC, fixtures, tax liens, suits and judgments) for Borrowers, Eisenhower and Owners and updates thereto

4.    Opinion of counsel to Borrower and Owners

D.    <u>Post-Closing items</u>:

1.    Post-filing UCC searches

## EXHIBIT J

### Form of Notice of Borrowing

See attached.

Attention: Ms. Terri Weiner
Vice President
RZB Finance LLC
1133 Avenue of the Americas
New York, New York 10036

Via Fax: 212-391-9670 or
Via E-mail: tweiner@rzbfinance.com

Re: Loan and Security Agreement dated as of June 14, 2006 (the "Loan Agreement")

Dear Sirs/Madams:

Pursuant to section 5 (a) (i) of the Loan and Security Agreement, Stone Warehouse, LLC (the "Borrower") hereby requests a Loan as follows:

| Borrower: | Stone Warehouse, LLC |
|---|---|
| Principal Amount: | $ |
| Borrowing Date: | June 15, 2006 |
| Bank Account to be credited: | Fifth Third Bank<br>Account # |

The Borrower certifies that upon the making of the Loan requested pursuant to this Request for Loan, the aggregate amount of the Loans will not exceed the Maximum Available Revolving Credit Amount.

The Borrower further certifies that, as of the date of this Request for Loan, ** [except to the extent waived by lender in writing] ** (i) the representations and warranties of the Borrower set forth in the Loan Agreement are true and correct as though made on and as of this date, (ii) no Default or Event of Default has occurred, and (iii) all other conditions and requirements as set forth the Loan and Security Agreement are satisfied.

Capitalized terms used herein without definition shall have the meaning set forth in the Loan and Security Agreement.

Very truly yours,

| STONE WAREHOUSE, LLC | STONE WAREHOUSE, LLC |
|---|---|
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |
| Signature: _____ | Signature: _____ |

Attention: Ms. Terri Weiner
Vice President
RZB Finance LLC
1133 Avenue of the Americas
New York, New York 10036

Via Fax: 212-391-9670 or
Via E-mail: tweiner@rzbfinance.com

Re: Loan and Security Agreement dated as of June 14, 2006 (the "Loan Agreement")

Dear Sirs/Madams:

Pursuant to section 5 (a) (i) of the Loan and Security Agreement, Pyramid Stone Mfg., Inc. (the "Borrower") hereby requests a Loan as follows:

| Borrower: | Pyramid Stone Mfg., Inc. |
|---|---|
| Principal Amount: | $ |
| Borrowing Date: | June 15, 2006 |
| Bank Account to be credited: | Fifth Third Bank Account # |

The Borrower certifies that upon the making of the Loan requested pursuant to this Request for Loan, the aggregate amount of the Loans will not exceed the Maximum Available Revolving Credit Amount.

The Borrower further certifies that, as of the date of this Request for Loan, ** [except to the extent waived by lender in writing] ** (i) the representations and warranties of the Borrower set forth in the Loan Agreement are true and correct as though made on and as of this date, (ii) no Default or Event of Default has occurred, and (iii) all other conditions and requirements as set forth the Loan and Security Agreement are satisfied.

Capitalized terms used herein without definition shall have the meaning set forth in the Loan and Security Agreement.

Very truly yours,

| PYRAMID STONE MFG., INC. | PYRAMID STONE MFG., INC. |
|---|---|
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |
| Signature: _____ | Signature: _____ |

## EXHIBIT K

Litigation

| Defendant | Jurisdiction | Status | Case Number | Filing Date | Plaintiff | Amount |
|---|---|---|---|---|---|---|
| Pyramid Stone Manufacturing, Inc | Illinois DuPage County | **JUDGMENT APPEARS OPEN AS OF 5/26/06** | R99-108279 | 05/12/99 | Michael Accomando d/b/a Pro Tile Interiors | $1,025.00 |