IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **RZB FINANCE LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | No. 07 C 6603 |
| | ) | |
| vs. | ) | Judge Milton I. Shadur |
| | ) | |
| **PYRAMID STONE MFG., INC. and 11 S. EISENHOWER, LLC** | ) ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF CHRISTOPH HOEDL

I, Christoph Hoedl, pursuant to 28 U.S.C. § 1746, declare under the penalty of perjury as follows:

1. I am currently employed as a Group Vice President of RZB Finance, LLC ("RZB"). My responsibilities include managing RZB's asset-based lending group, which includes the asset-based loan that is the subject of the above-captioned lawsuit. I have personal knowledge of the matters set forth herein, and could and would testify competently thereto if called as a witness in this matter.

2. RZB is a Delaware limited liability company, with its principal place of business in New York, New York. The sole member of RZB is Raiffeisen Zentralbank Österreich AG, an Austrian corporation.

3. On or about June 19, 2006, RZB, as lender, and Pyramid Stone Mfg., Inc. ("Pyramid Stone") and Stone Warehouse, LLC ("Stone Warehouse") (collectively the "Borrowers") executed a Loan and Security Agreement (as amended, modified and supplemented from time to time, the "Loan Agreement") and certain related agreements,

pursuant to which RZB extended a secured line of credit of up to $5,000,000 to the Borrowers.  A true and correct copy of the Loan Agreement is included in <u>Group</u> <u>Exhibit A</u>, attached hereto.[1]  As part of my duties, I am familiar with the Loan Agreement.  The Loan Agreement is part of records normally created, maintained and relied upon by RZB throughout the course of a lending relationship between RZB and its borrower.

    4.  To secure its performance under the Loan Agreement, the Borrowers granted RZB a continuing security interest in the following:

> (a) all Accounts and all Goods whose sale, lease or other disposition by such Borrower has given rise to Accounts and have been returned to or repossessed or stopped in transit by such Borrower; (b) all Chattel Paper, Instruments, Documents, and General Intangibles (including without limitation all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contracts rights, payment intangibles, security interests, security deposits, and any rights to indemnification); (c) all Inventory and other Goods, including without limitation Equipment, vehicles and Fixtures; (d) all Investment Property; (e) all Deposit Accounts, bank accounts, deposits and cash; (f) all Letter-of-Credit Rights; (g) Commercial Tort Claims listed on Exhibit H [t]hereto; (h) any other property of Borrower now or hereafter in the possession, custody or control of Lender or any agent or any Affiliate of Lender or any participant with Lender in the Loans for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise); and (i) all additions and accessions to, substitutions for, and replacements, products and proceeds of the foregoing property, including without limitation proceeds of all insurance policies insuring the foregoing property, and all of such Borrower's books and records relating to any of the foregoing and to such Borrower's business.

(hereinafter, the "Collateral").  RZB timely filed UCC-1 financing statements to perfect its first priority security interest in the Collateral.  True and correct copies of the UCC-1

---

[1] On or about September 29, 2007, Stone Warehouse executed a Trust Agreement and Assignment for the Benefit of Creditors (the "Stone Warehouse ABC"), thereby transferring all of its assets to a Trustee-Assignee.  Consequently, RZB seeks no relief with respect to Stone Warehouse, at the present time.

Financing Statements filed by RZB to perfect its first priority security interest in the Collateral are attached hereto as Exhibit B.

      5.    Pursuant to the Loan Agreement, upon an Event of Default, RZB is entitled, inter alia, to take possession of and sell the Collateral and keep the proceeds as a credit to the amounts owed under the Loan Agreement.

      6.    Pursuant to Section 13(q) of the Loan Agreement,

> Each Borrower shall reimburse Lender for all costs and expenses, including without limitation reasonable legal expenses and attorneys' fees, incurred by Lender in connection with documentation, consummation and administration of this Agreement and any other transactions between any Borrower and Lender, including without limitation UCC and other public record searches, lien filings, Federal Express or similar express or messenger delivery, administrative fees, appraisal and field examination costs and fees, surveys, title insurance and environmental audit or review costs, and in seeking to administer, collect, protect or enforce any rights in or to the Collateral or incurred by Lender in seeking to collect any Liabilities and to administer and/or enforce any of Lender's rights under this Agreement and the Other Agreements.[2]  All such costs, expenses and charges shall be netted against the most recent administrative fee paid by Borrowers pursuant to Section 4(d) until such amount is zero and thereafter, such costs, expenses and charges shall constitute Revolving Loans hereunder, shall be payable by Borrowers to Lender on demand, and, until paid, shall bear interest at the highest rate then applicable to Revolving Loans hereunder. . . .

      7.    Pursuant to Section 25(a) of the Loan Agreement, "[n]otwithstanding anything to the contrary contained herein, all Liabilities of each Borrower hereunder shall be joint and several obligations of Borrowers."

---

[2]  "Other Agreements" as defined under the Loan Agreement means "all agreements, instruments and documents, including without limitation guaranties, mortgages, trust deeds, pledges, powers of attorney, consents, assignments, security agreements, intercreditor agreements, financing statements and all other writings heretofore, now or from time to time hereafter executed by or on behalf of any Borrower or any other Person and delivered to Lender or to any Affiliate of Lender in connection with the Liabilities or the transactions contemplated hereby."  (Ex. A, Loan Agreement at p. 10.)

8. RZB first disbursed funds pursuant to the Loan Agreement to the Borrowers on or about June 19, 2006.

9. On or about May 30, 2007, RZB sent a letter to the Borrowers notifying them that they were in default under the Loan Agreement, reserving RZB's rights to exercise any of the rights and remedies available under the Loan Agreement and under the law and demanding that the Borrowers, among other things, disclose the required financial information under the Loan Agreement (the "May 30 Letter"). A true and correct copy of the May 30 Letter is attached hereto as <u>Exhibit C</u>.

10. On or about October 19, 2007, the Borrowers and RZB entered into a Third Amendment and Forbearance Agreement ("Forbearance Agreement"), wherein the Borrowers acknowledged that they were in default of their obligations under the Loan Agreement. In the Forbearance Agreement, RZB agreed to forbear from exercising its rights and remedies under the Loan Agreement only until October 26, 2007. A true and correct copy of the Forbearance Agreement is attached hereto as <u>Group Exhibit D</u>.

11. In the Forbearance Agreement, the Borrowers acknowledged that as of September 30, 2007, their indebtedness to RZB pursuant to the Loan Agreement stood at not less than $2,411,792.26, plus accrued and accruing interest, fees and other costs.

12. On or about October 26, 2007, the Borrowers and RZB entered into a First Amendment to Forbearance Agreement ("First Amendment to Forbearance Agreement"). In the First Amendment to Forbearance Agreement, the Borrowers again acknowledged that they were in default of their obligations under the Loan Agreement, and RZB agreed to forbear from exercising its rights and remedies under the Loan Agreement

only until November 5, 2007. A true and correct copy of the First Amendment to Forbearance Agreement is included in <u>Group Exhibit D</u> attached hereto.

        13.    On or about November 6, 2007, RZB sent a letter to the Borrowers notifying them that they were in default under the Loan Agreement and that under the terms of the Loan Agreement, RZB was declaring all amounts owing by Borrowers to RZB to be immediately due and payable (the "November 6 Letter"). A true and correct copy of the November 6 Letter is attached hereto as <u>Exhibit E</u>.

        14.    On November 14, 2007, RZB sent a letter to Pyramid Stone asking that Pyramid Stone agree, among other things, to immediately abandon and surrender possession of the Collateral to RZB (the "November 14 Letter"). A true and correct copy of the November 14 letter is attached hereto as <u>Exhibit F</u>.

        15.    On November 26, 2007, RZB filed a complaint alleging breach of contract, replevin and conversion against Pyramid Stone and action for declaratory judgment against Landlord (the "Complaint").

        16.    As of the filing of the Complaint, Borrowers had not repaid their outstanding indebtedness to RZB, nor has Pyramid Stone turned over the Collateral to RZB.

        17.    On November 30, 2007, this Court entered an Order for Replevin against Pyramid Stone, which the Court amended on December 7, 2007 and on December 11, 2007 ("Second Amended Order for Replevin"). A true and correct copy of the Second Amended Order for Replevin is attached hereto as <u>Exhibit G</u>.

        18.    On January 3, 2008, this Court entered a Default Judgment Order, a true and correct copy of which is attached hereto as <u>Exhibit H</u>, by which, among other things, the Court entered an order of default, pursuant to Fed. R. Civ. P. 55(a) against Pyramid Stone

on Counts I and III of RZB's Complaint and scheduled the matter for prove-up with respect to damages on Counts I and III.

19. As of November 30, 2007, the amounts of principal and accrued interest, respectively, for Pyramid Stone and Stone Warehouse are:

|  | **Pyramid Stone** | **Stone Warehouse** |
|---|---|---|
| Principal | $1,503,181.24 | $952,422.52 |
| Interest | $14,453.09 | $24,129.15 |
| Total | $1,517,634.33 | $976,551.67 |

A true and correct copy of the Customer Lending Interest Accrual spreadsheet as of November 30, 2007, is attached hereto as Exhibit I.

20. On December 14, 2007, an additional draw on the Stone Warehouse facility in the amount of $28,772.80 occurred. A true and correct copy of the draw request is attached hereto as Exhibit J. As a result, the principal amount for Stone Warehouse increased to $981,195.32.

21. Between December 1, 2007 and January 10, 2008, additional interest accrued. The amount of December interest was $14,885.58 for Pyramid Stone and $12,778.34 for Stone Warehouse. The amount of interest between January 1, 2008 and January 10, 2008 was $4,227.67 for Pyramid Stone and $3,727.80 for Stone Warehouse. A true and correct copy of the correspondence sent to Pyramid Stone and Stone Warehouse in the ordinary course evidencing the December and January interest amounts is attached hereto as Group Exhibit K.

22. Between December 1, 2007 and January 10, 2008, additional commitment fees were incurred in accordance with Section 4(c) of the Loan Agreement[3]. The amount of the commitment fees were $207.01 for Pyramid Stone and $853.16 for Stone Warehouse. A true and correct copy of the correspondence to Pyramid Stone and Stone Warehouse in the ordinary course evidencing the commitment fees is attached hereto as Group Exhibit L.

23. Section 4(d) of the Loan Agreement provides that "Borrowers shall pay to Lender a monthly administrative fee equal to $3,000.00, which fee shall be fully earned by Lender and payable on the date that Lender makes its initial disbursement under this Agreement and on each month anniversary of the date." As a result, Borrowers owe an administrative fee of $3,000.00 for December 2007.

24. RZB incurred field examination fees in the amount of $6,637.65. A true and correct of the invoice is attached hereto as Exhibit M.

25. RZB incurred fees and expenses for security guard services at the Pyramid Stone premises for the period of November 9, 2007 through January 10, 2008 in the total amount of $40,068.00. A true and correct copy of the invoices through December 20, 2007 in the amount of $25,956.00 is attached hereto as Exhibit N. For the period of December 21, 2007 through January 10, 2008, the amount charged is $28.00 per hour for 504 hours, totaling $14,112.00.

---

[3] Section 4(c) of the Loan Agreement provides: "Borrowers shall pay to Lender an unused line fee of 3/8 of one percent (0.375%) of the difference between (i) the PS Maximum Revolving Loan Facility plus the SW Maximum Revolving Loan Facility and (ii) the average daily balance of the Revolving Loans plus the PS Letter of Credit Obligations and the SW Letter of Credit Obligations for each month, which fee shall be fully earned by Lender and payable monthly in arrears on the first business day of each month."

26. RZB has incurred legal fees which will be provided prior to the Prove-Up Hearing.

27. As of January 10, 2008, the total amount owed RZB by the Borrowers is $2,602,706.36.

28. I declare under the penalties of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

-7-

Executed on this 9 th day of January, 2008.

_____
CHRISTOPH HOEDL